In the Matter of the **EXTRADITION OF Sukhminder Singh SANDHU, a/k/a "Sukhi," and Ranjit Singh Gill, a/k/a "Kukki," Respondents.**

No. 90 Cr.Misc. No. 1.

United States District Court, S.D. New York.

April 15, 1993.

*OPINION AND ORDER*

ROBERTS, United States Magistrate Judge:

The government of India, pursuant to 18 U.S.C. § 3184 and the treaty of extradition between the governments of the United States and India,[1] seeks the extradition of Sukhminder Singh Sandhu, a/k/a "Sukhi," and Ranjit Singh Gill, a/k/a "Kukki" ("respondents" or "extraditees") for the alleged commission of crimes occurring in 1985 and 1986, in violation of the Indian Penal Code. This case was referred to me by Judge Edelstein as an extradition magistrate pursuant to 18 U.S.C. § 3184.

Presently before the court is respondents' pre-hearing motion; for the reasons set forth below, the motion is denied.

*PROCEDURAL HISTORY*

Sandhu and Gill were first arrested in this country on May 14, 1987, in the District of New Jersey. Sandhu's arrest was pursuant to a warrant issued by the Central District of California, based upon an extradition complaint filed against him there. Gill was detained by U.S. immigration officials and held in custody until an extradition complaint was filed against him and a warrant of arrest issued in the District of New Jersey. In February 1988, extradition hearings were conducted in the District of New Jersey by Magistrate Ronald J. Hedges. Magistrate Hedges concluded that Sandhu and Gill were extraditable and issued certificates of extraditability. On March 7, 1988, Sandhu and Gill challenged Magistrate Hedges' decision by filing habeas corpus petitions in the Southern District of New York, where they

---

**1.** Extradition Treaty with Great Britain, December 22, 1931, 47 Stat. 2122, T.S. No. 849 [applicable to India in accordance with Art. 14 from March 9, 1942]. Respondents' Memorandum of Law in Support of their Pre-hearing Motion ("Resp. Memo") at 6 n. 9.

were incarcerated. Subsequently, the government moved to vacate the certificates of extraditability issued by Magistrate Hedges and to renew the case based on the discovery of misconduct by the Special Assistant United States Attorney who had represented the government in the extradition hearings.[2] The habeas corpus proceedings were held in abeyance while further proceedings before Magistrate Hedges addressed the effect of the misconduct of the Special Assistant.

In November 1988, Magistrate Hedges denied the government's motion to vacate the certificates, adhering to his earlier ruling that extradition was warranted.

Petitions for habeas corpus were filed in the Southern District of New York, and assigned to Judge Sweet. Judge Sweet granted the petitions, on the ground that a confession of an alleged co-conspirator, which had been part of the evidence reviewed by Magistrate Hedges, had later been held invalid by an Indian court. *Gill v. Imundi*, 747 F.Supp. 1028 (S.D.N.Y.1990). Judge Sweet concluded that the case should be remanded for a new determination of probable cause on extraditability, in order to eliminate the possibility that the probable cause finding would in any way be affected by either the suppression of the co-conspirator's confession or by the misconduct of the Special Assistant. *Id.*

Judge Sweet stayed the issuance of the writs to permit the government of India to appeal or file a new complaint. *Id.* The instant complaint was filed in the Southern District of New York in October 1990.

## EXTRADITION COMPLAINT

The government of India seeks the extradition of Sandhu and Gill for alleged commission of crimes in violation of the Indian Penal Code. The charges against Sandhu are contained in Counts One through Three,[3] and the charges against Gill are set forth in a separate Count One pertaining solely to Gill.

2. The Special Assistant had fabricated threatening letters to herself and to the Magistrate, designed to appear as if they had been sent by sympathizers of Sandhu and Gill.

3. Count Four, which charges Sandhu with wrongful confinement and wrongful confinement

*Charges Against Sandhu*

Count One of the complaint charges Sandhu with robbery and conspiracy to commit robbery, in violation of §§ 392 and 120B of the Indian Penal Code, in connection with the robbery of the Punjab National Bank in Ahmedabad, India, on January 6, 1986. Complaint ¶¶ 2, 4. A warrant for the arrest of Sandhu on these charges was issued by the Metropolitan Magistrate, Court Number 9, Ahmedabad, India, on or about May 10, 1987. *Id.* ¶ 3.

Count Two charges Sandhu with murder, attempted murder and "murder in furtherance of a common intention," in violation of §§ 34, 302 and 307 of the Indian Penal Code, in connection with the murders and attempted murders of unarmed police officers and a civilian magistrate at Udaipur, India, on April 16, 1986. *Id.* ¶¶ 5, 7. A warrant for the arrest of Sandhu on these charges was issued by the Additional Chief Judicial Magistrate, Udaipur, India, on or about January 5, 1987. This warrant was followed by a "petition for issuance of additional process" on or about May 8, 1987; additional process requiring Sandhu to appear to answer the charges was issued by the Additional Chief Judicial Magistrate at Udaipur on or about May 8, 1987. *Id.* ¶ 6.

Count Three charges Sandhu with robbery and conspiracy to commit robbery, in violation of §§ 392 and 120B of the Indian Penal Code, in connection with the robbery of the Chembur branch of the New Bank of India at Bombay, India, on April 28, 1986. *Id.* ¶¶ 8, 10. A warrant for the arrest of Sandhu on these charges was issued by the Metropolitan Magistrate, Bombay, India, on or about May 8, 1987. *Id.* ¶ 9.

*Charges Against Gill*

The complaint charges Gill with murder, attempted murder and "murder in fur-

in furtherance of a common intention arising out of the abduction of a police officer at Antop Hill, India on May 3, 1986, has been withdrawn by the government of India. Extradition Hearing Memorandum Submitted on Behalf of the Government of India at 1 n. 1.

ther[ance] of a common intention," in violation of §§ 34, 302 and 307 of the Indian Penal Code, in connection with the murders of Lalit Maken, a member of the Indian Parliament, his wife, and a constituent of Mr. Maken's on July 31, 1985, in Delhi, India. *Id.* ¶¶ 17, 19; Resp.Memo at 6. A warrant for the arrest of Gill on these charges was issued by the Chief Metropolitan Magistrate, Tis Hazari Court, Delhi, India, on or about December 6, 1986. The warrant was followed by a "petition for issuance of additional process" on or about April 3, 1987; additional process requiring Gill to appear to answer the charges was issued by the Chief Metropolitan Magistrate, Tis Hazari Court, Delhi, on or about April 29, 1987. Complaint ¶ 18.

### RESPONDENTS' PRE–HEARING MOTION

Sandhu and Gill move for the following orders:

1. an order granting them leave to present evidence that if extradited to India, they will be subjected to treatment and procedures "antipathetic to a federal court's sense of decency";

2. an order granting them leave to present evidence that they are refugees, and, if extradited to India, will be subject to persecution;

3. an order denying the extradition request in its entirety on the ground that controlling Indian law compels the government of India to try respondents on charges already lodged against them but for which their extradition has not been sought, thereby violating the extradition treaty and the rule of specialty; and

4. an order granting certain discovery requests.[4]

Resp. Memo at 18–19.

### I

### Examination of Conditions Facing Respondents if Extradited

■ Respondents request permission to present evidence that if extradited, they will be subjected to treatment and procedures "antipathetic to a federal court's sense of decency." Resp.Memo at 18. This request must be denied under the "rule of non-inquiry," which prohibits the court determining extraditability from examining the requesting country's criminal justice system or taking into account the possibility that the extraditee will be mistreated if returned. *See* Jacques Semmelman, *Federal Courts, The Constitution and the Rule of Non–Inquiry in International Extradition Proceedings,* 76 CORNELL L.REV. 1198 (1991).

■ An extradition magistrate acts only under the special authority of 18 U.S.C. § 3184 and an extradition treaty. Pursuant to § 3184, an extradition magistrate has jurisdiction only to determine whether the crimes charged are covered by the extradition treaty at issue, that the persons before the court are those sought by the extradition request and whether probable cause exists that those requested to be extradited committed the crimes charged. Semmelman, *supra,* at 1202. If probable cause is found, the extradition magistrate issues a certificate of extradition to the Secretary of State. *Id.* at 1203. There is no statutory authority or provision in the extradition treaty between the United States and India that confers jurisdiction on an extradition magistrate to inquire into the conditions that might be encountered by an extraditee upon return to India. *See id.* at 1205 ("[a]ll circuits that have considered the issue have adopted the rule of non-inquiry, even when the defendant is a United States citizen"). Accordingly, this court lacks jurisdiction to engage in such an inquiry.

■ The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 431–33, 84 S.Ct. 923, 942–43, 11 L.Ed.2d 804 (1964). For this reason, the ultimate decision to deny extradition on humanitarian grounds has been en-

---

**4.** At the conference held on June 26, 1992, respondents withdrew their request for an order directing the present Indian government to ratify the extradition request dated October 24, 1990.

*See* Resp. Memo at 19, 84–86; Memorandum Submitted on Behalf of the Government of India in Opposition to Respondents' Pre-hearing Motion ("Gov't Memo") at 29.

trusted to the Secretary of State, not to an extradition magistrate. *Ahmad v. Wigen,* 910 F.2d 1063, 1067 (2d Cir.1990) ("[i]t is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds"); *Sindona v. Grant,* 619 F.2d 167, 174 (2d Cir.1980) ("the degree of risk to [appellant's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch").

Relying on *Gallina v. Fraser,* 278 F.2d 77 (2d Cir.), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960), respondents contend that authority exists for an examination of conditions by the extradition magistrate when the extraditee can show that he would "be subjected to treatment offensive to a federal court's sense of decency." Resp. Memo at 40. In *Gallina,* the Second Circuit refused "to inquire into the procedures which await the [extraditee] upon extradition." *Gallina,* 278 F.2d at 78. The court observed that existing authority "points clearly to the proposition that the conditions under which a fugitive is to be surrendered to a foreign country are to be determined solely by the non-judicial branches of the Government." *Id.* at 79. In *dicta,* the court stated it could "imagine situations" where the extraditee "would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle [of non-inquiry] set out above." *Id.*

The "*Gallina* exception" to the rule of non-inquiry has yet to be applied. *See Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir.1983) (*Gallina dictum* exception "has yet to be employed in an extradition case"); *Ahmad v. Wigen,* 726 F.Supp. 389, 413 (E.D.N.Y.1989) ("*Gallina* exception to the rule of non-inquiry has apparently yet to be invoked to prevent extradition"), *aff'd,* 910 F.2d 1063 (2d Cir.1990). Moreover, since *Gallina,* courts have not only consistently upheld the rule of non-inquiry, but have also repeatedly ordered extradition despite allegations of serious con-

ditions that might face the extraditee. *See, e.g., Linnas v. INS,* 790 F.2d 1024 (2d Cir.) (allegation that subject of deportation proceedings faced death sentence and absence of due process), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986); *Escobedo v. United States,* 623 F.2d 1098 (5th Cir.) (allegation that extraditee faced torture and murder if returned to requesting state), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980); *Sindona,* 619 F.2d at 174 (allegation that extraditee faced risk of murder or injury at the hands of his political enemies).

In *Sindona,* the Second Circuit expressly rejected Sindona's assertion that *Gallina* requires the extraditing magistrate to consider whether the circumstances awaiting a fugitive upon extradition would be so egregious as to offend the court's "sense of decency." *Sindona,* 619 F.2d at 174–75. The Court found

> no such rule in *Gallina.* That decision denied *habeas corpus* on the strength of established authority holding that the federal courts may not "inquire into the procedures which await the relator upon extradition," 278 F.2d at 78. The fact that *Gallina* also added the caveat that some situations were imaginable in which a federal court might wish to reexamine the principle of exclusive executive discretion, *id.* at 79, falls well short of a command to do so here.

*Sindona,* 619 F.2d at 175. Finally, in *Ahmad v. Wigen,* 910 F.2d 1063 (2d Cir.1990), the Second Circuit again repudiated the *Gallina dictum,* finding the district court's inquiry into conditions in Israel to be improper and ruling that "consideration of the procedures that will or may occur in the requesting country is not within the purview of a habeas corpus judge."[5] *Id.* at 1066. Indeed, the court went on to state that "there is substantial authority for the proposition that this is not a proper matter for consideration by the certifying judicial officer." *Id.*

---

**5.** This statement was itself dictum since the Court of Appeals agreed with the district court's finding that the extraditee would be treated fairly if returned. However, the Second Circuit was clear in its disapproval of any inquiry by the district court into conditions allegedly faced by the extraditee.

Based upon the above authority, respondents' request to present evidence relative to their claim under *Gallina* that, if extradited, they will face treatment "antipathetic to a federal court's sense of decency," is denied.

## II

### *Refugee Status*

■ Respondents move to present testimonial and documentary evidence on their claim that they are refugees and if extradited will be subject to persecution. This motion, however, goes beyond a mere request to "present evidence" to the court. Respondents claim that they are refugees under the United Nations Protocol Relating to the Status of Refugees, January 31, 1967, 19 U.S.T. 6223 (the "Protocol"), that "[t]his Court can and must make the determination that [they] are refugees," and that the Protocol bars their extradition. Resp. Memo at 46. Respondents contend that the extradition court is obligated to hear their refugee claim because the extradition treaty can only be interpreted and enforced by taking into consideration the principle of *non-refoulement* embodied in the Protocol, and because this court is their only means of obtaining a declaration of refugee status. Resp. Memo at 46, 49.[6]

### *The Protocol*

■ In 1968, the United States acceded to the Protocol, 19 U.S.T. 6223–58, which incorporates certain provisions of the 1951 Convention Relating to the Status of Refugees (the "U.N. Convention"), 19 U.S.T. 6259–88. *See INS v. Stevic,* 467 U.S. 407, 416, 104 S.Ct. 2489, 2494, 81 L.Ed.2d 321 (1984); *Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1326, 1344 (2d Cir.1992) (*"Haitian Centers I "*). However, since the Protocol is not

a self-executing treaty, it does not confer any rights upon persons beyond those granted by the implementing domestic legislation. *Haitian Centers I,* 969 F.2d at 1344 n. 13 ("the Protocol does not grant rights beyond those afforded under this nation's domestic law"); *Bertrand v. Sava,* 684 F.2d 204, 218–19 (2d Cir.1982). The Refugee Act of 1980 amended the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1524, to conform this nation's domestic laws with its treaty obligations under the Protocol. *Haitian Centers I,* 969 F.2d at 1344 (citing *Chun v. Sava,* 708 F.2d 869, 870 n. 2 (2d Cir.1983)); *Azzouka v. Sava,* 777 F.2d 68, 72 (2d Cir. 1985), *cert. denied,* 479 U.S. 830, 107 S.Ct. 115, 93 L.Ed.2d 62 (1986).

The Protocol defines a "refugee" as any person who

> owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, unwilling to avail himself of the protection of that country[.]

19 U.S.T. 6223, 6225, 6261; *see* 8 U.S.C.A. § 1101(a)(42)(A) (West Supp.1993) (definition of refugee in Refugee Act of 1980).

Article 33 of the U.N. Convention, entitled "Prohibition of Expulsion or Return ('Refoulement')," reads:

> 1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

---

6. Respondents acknowledged in a September 1, 1992 letter to the court and during a conference held on October 5, 1992, that they could seek to have their refugee claim heard by an "Asylum Officer." 8 C.F.R. § 208.2(a) (1991); *see also* 8 C.F.R. §§ 208.4, 208.9, 208.11, 208.13, 208.14, 208.16 and 208.18 (1991). It appears, however, that the government is not required to give an alien an asylum hearing where the INS determines that he falls within the exclusions set forth in 8 U.S.C. § 1253(h)(2), which include "serious reasons for considering that the alien has committed a serious nonpolitical crime outside the

United States prior to the arrival of the alien in the United States." 8 U.S.C.A. § 1253(h)(2)(C) (West Supp.1993); *see Azzouka v. Sava,* 777 F.2d 68, 73 (2d Cir.1985) (holding that mandatory withholding of deportation does not apply to certain limited categories of aliens, including situations covered by 8 U.S.C. § 1253(h)(2)(D) where the alien can be reasonably regarded as a danger to the security of the United States), *cert. denied,* 479 U.S. 830, 107 S.Ct. 115, 93 L.Ed.2d 62 (1986). That determination, however, is subject to review by habeas corpus. *See id.* at 76.

2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country. 19 U.S.T. 6259, 6276; *see Haitian Centers Council, Inc., v. McNary,* 969 F.2d 1350, 1361 (2d Cir.), *cert. granted,* — U.S. —, 113 S.Ct. 52, 121 L.Ed.2d 22 (1992) (*"Haitian Centers II"*); *see also* 8 U.S.C.A. § 1253(h)(1) (West Supp.1993) (provision prohibiting Attorney General from returning alien to a country if Attorney General determines that alien's "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion").

The U.N. Convention also excludes from its protection any person with respect to whom there are serious reasons for considering that "he has committed a serious nonpolitical crime outside the country of refuge prior to his admission to that country as a refugee." 19 U.S.T. 6259, 6263–64; *see also* 8 U.S.C.A. § 1253(h)(2)(C) (West Supp.1993) (§ 1253(h)(1) does not apply if the Attorney General determines that "there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States"); 8 C.F.R. § 208.16(c)(2)(iii) (1991) (same).

In *Sindona,* the United States, acting on behalf of the Republic of Italy, commenced an extradition proceeding against Michele Sindona, an Italian citizen, charged with the Italian crime of "fraudulent bankruptcy." *Sindona,* 619 F.2d at 169. Sindona was held extraditable by Judge Griesa, acting as committing judicial officer. Sindona argued that he was exempt from extradition under Article 33 of the United Nations Convention, because paragraph 1 of that Article precludes the expulsion or return of a refugee whose life or freedom would be threatened *inter alia* "on account of his * * * political opinion." *Id.* at 174. The Second Circuit observed that Article 1F of the U.N. Convention excludes from that document's protec-tion "any person with respect to whom there are serious reasons for considering that: * * * (b) he has committed a serious nonpolitical crime outside the country of refuge prior to his admission to that country as a refugee." *Id.* (quoting Article 1F of the U.N. Convention, 19 U.S.T. 6259, 6263–64). The Court held that Judge Griesa's determination of probable cause and rejection of the political offense claim brought under the extradition treaty between the United States and Italy, "led inexorably" to his conclusion that there was " 'serious reason' for believing that Sindona had committed a 'serious non-political crime.' " *Id.* Accordingly, the Court of Appeals held that Sindona was not exempt from extradition under the U.N. Convention and further stated that "[n]either the record before us nor the plain language of Article 1F indicates that the U.N. Convention claim merited any additional determination, much less an evidentiary hearing." *Id.*

I am persuaded by the above authorities that the proper scope of these extradition proceedings is the determination of whether the evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention," 18 U.S.C. § 3184, and, to the extent the extradition treaty provides and respondents assert a "political offense exception," whether the offenses charged were political within the meaning of such an exception. Respondents' motion to present evidence of their status as refugees and potential persecution if returned to India is therefore denied.

### III

*Doctrine of Specialty*

■ Article 7 of the applicable Extradition Treaty, 47 Stat. 2122, provides that an extraditee "can in no case be kept in custody or be brought to trial * * * for any other crime or offence [sic] * * * than those for which the extradition shall have taken place." *See supra* note 1. Article 7 codifies the "doctrine of specialty," long recognized in international law, which prohibits the requesting country from prosecuting an extraditee for crimes committed before the extradition, but for which extradition was not granted. *See Sha-*

*piro v. Ferrandina,* 478 F.2d 894, 905 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973).

 Respondents contend that an Indian statute, the Terrorist and Disruptive Activities (Prevention) Act, 1985 (TADA) requires the Indian Government to proceed against Respondents first on charges now pending against them under TADA, but for which their extradition has not been sought. Respondents assert that because India has not sought their extradition on the TADA charges, a trial on the TADA charges in India will violate Article 7 and the doctrine of specialty. Respondents therefore argue that it is impossible for India to comply with Article 7 of the Treaty, and that the extradition request should therefore be denied. Resp. Memo pp. 59–62.

Assuming without deciding that compliance with the TADA would violate Article 7 of the Treaty and the doctrine of specialty, I find that respondents lack standing to assert the doctrine of specialty as a defense to extradition.

As a matter of international law, the doctrine of specialty has been viewed as a privilege of the asylum state, designed to protect the interests of the asylum state, and not as a right accruing to the accused. *Shapiro,* 478 F.2d at 906. The extradition treaty at issue is between the United States and India and as it constitutes an agreement between the governments of those two countries, it is for the United States Government to insist on India's compliance with the treaty provision. *Demjanjuk v. Petrovsky,* 776 F.2d 571, 584 (6th Cir.1985). Therefore, respondents lack standing to raise the issue of possible violation of the treaty as a defense.

## IV

### *Request for Discovery*

 Respondents request extensive discovery, which they assert is relevant to the issues of probable cause and identity. Resp. Memo at 63–80. Although it is within the court's discretion to permit discovery in connection with an extradition proceeding, it is well-established that an extradition proceeding is "not to be converted into a dress rehearsal trial." *Jhirad v. Ferrandina,* 536 F.2d 478, 484 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). Respondents have already amassed voluminous evidence pertaining to the allegations in this case. In light of the evidence already available to respondents, and the limited nature of an extradition proceeding, *see generally* Gov't Memo at 3–10, I decline to order further discovery, except to the extent the government has agreed to provide particular items.

## CONCLUSION

Respondents' pre-hearing motion is denied. The parties are directed to appear for a status conference on May 7, 1993, at 11:00 a.m. in Room 631 of the United States Courthouse.

SO ORDERED.