**In the Matter of EXTRADITION
OF John CHEUNG.**

**No. 3:96 M 158(JGM).**

United States District Court,
D. Connecticut.

April 30, 1997.

Richard A. Reeve, Federal Public Defender's Office, New Haven, CT, for John Cheung.

Christopher F. Droney and Jeffrey A. Meyer, U.S. Attorney's Office, New Haven, CT, for U.S.

### RULING ON REQUEST FOR EXTRADITION

MARGOLIS, United States Magistrate Judge.

On December 20, 1996, this Magistrate Judge issued a warrant for the arrest of John Cheung [ "Cheung" or "defendant"], to answer an extradition complaint. The complaint charges him with the commission of offenses involving financial deception for

which a request for extradition to Hong Kong was made pursuant to a treaty between the United States and the United Kingdom. (Dkt.# # 1–3, 15). The United States Attorney's Office for the District of Connecticut ["the Government"] is pursuing Cheung's extradition in response to a formal request from the Government of the United Kingdom ["U.K."] which is, in turn, acting on behalf of the Government of Hong Kong.[1]

Cheung was arrested on December 26, 1996 and presented before U.S. Magistrate Judge William I. Garfinkel; the Government filed a motion for pretrial detention that day and an Order of Temporary Detention was entered. (*See* Dkt. # # 4–9, 11, 15). On December 31, 1996, the Federal Public Defender's office was appointed to represent Cheung. (Dkt.# 10). On January 7, 1997, the Government filed a pre-hearing memorandum of law regarding extradition. (Dkt.# 12).[2]

On January 9, 1997, the parties participated in a telephonic status conference with this Magistrate Judge in which separate hearings were scheduled on the issues of bond and extradition. On January 17, 1997, a hearing was held after which Cheung's request for release on bail was denied and the Government's motion for pretrial detention was granted. (Dkt.# # 19–20).[3] Defendant filed multiple motions for continuance of extradition, which were granted over the Government's objection. (*See* Dkt. # 13 & 1/17/97 endorsement thereon, Dkt. # # 16, 21–22, 24–27).

The parties filed additional comprehensive briefs with respect to the pertinent issues of law regarding extradition in general and the unique legal issues at issue here. On March 14, 1997, defendant filed a pre-hearing memorandum in opposition to extradition to Hong Kong. (Dkt. # 28).[4] On March 21, 1997, the Government filed its response to defendant's pre-hearing memorandum. (Dkt. # 29).[5]

■ On March 26, 1997, a hearing was held during which exhibits and oral argument were received. (Dkt.# # 31–33).[6] Post-

1. Neither side has objected to having a Magistrate Judge handle this matter. *See* 18 U.S.C. 3184 & Rule 1(B) of the Local Rules for United States Magistrate Judges (authorizing Magistrate Judges to conduct extradition proceedings); *Austin v. Healey*, 5 F.3d 598, 601–04 (2d Cir.1993) (discussing jurisdictional authority of a Magistrate to hear extradition matters), *cert. denied*, 510 U.S. 1165, 114 S.Ct. 1192, 127 L.Ed.2d 542 (1994).

2. Three exhibits were attached: Declaration of Sally Cummins (Exh. A) to which was attached a copy of diplomatic note No. 125, dated October 29, 1996, a copy of the Treaty, and Supplementary Treaty at issue; Government's Statement of Factual Basis for Probable Cause (Exh. B); and a proposed Certification of Extraditability and Order of Commitment (Exh. C).

3. The parties filed multiple motions and briefs regarding bond, including defendant's motion for bail hearing, the Government's supplemental memorandum opposing release, and Cheung's memorandum in support of release on bail (Dkt.# # 14, 17–18). On March 25, 1997, defendant filed a motion for reconsideration of bail. (Dkt.# 30).

4. Nine exhibits were attached: an article from the *Washington Times*, dated January 8, 1997 (Exh. A); an article from the *South China Morning Post*, dated January 28, 1997 (Exh. B); an article from the *National Law Journal*, dated December 16, 1996 (Exh. C); testimony of Dick Thornburgh, dated June 6, 1995 (Exh. D); an article from the *Japan Economic Newswire*, dated December 11, 1996 (Exh. E); an article from the *International Herald Tribune*, dated January 27, 1997 (Exh. F); an article from the *New York Times*, dated February 7, 1997 (Exh. G); an article from the *Washington Post*, dated January 21, 1997 (Exh. H); and an article from the *Rocky Mountain News*, dated February 13, 1997 (Exh. I).

5. Attached was a copy of *United States v. Lui Kin–Hong*, 110 F.3d 103 (1st Cir.1997).

6. The Government's exhibits were as follows: original Declaration of Sally J. Cummins, dated October 30, 1996, with copies of the relevant documents attached (Exh. 1); original Declaration of Richard A. Boucher, Consul General of the United States in Hong Kong, dated October 17, 1996, with multiple attachments (Exh. 1a); three additional volumes of attachments to the Boucher Declaration (Exhs.2–4); fingerprint analysis performed by New Haven Department of Police Service, dated December 26, 1996 (Exh. 5); and copy of Sino–British Joint Declaration on the Question of Hong Kong, ratified on May 27, 1985 ["Joint Declaration"] (Exh. 6).

The Government had no objection to defendant's Exh. B, which was a copy of study on China Human Rights Practices, prepared by the U.S. Department of State, dated February 1995 (Exh. B), and thus that exhibit was admitted in full. The Government objected to defendant's Exh. A, which was a copy of a lengthy study,

hearing briefs were filed by both sides on April 7, 1997 (Dkt.# # 34–35),[7] by defendant on April 11, 1997 (Dkt.# 37), and by the Government on April 15, 1997 (Dkt.# 38).[8]

## I. DISCUSSION

Extradition of fugitives from a foreign country is governed by 18 U.S.C. § 3184, which provides, in pertinent part:

Whenever there is a treaty ... for extradition between the United States and any foreign government ... any magistrate authorized to do so by a court of the United States, ... may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty ... issue his warrant for

entitled, *Opening to Reform? An Analysis of China's Revised Criminal Procedure Law: Detention and Trial/Access to Counsel*, prepared by the Lawyers Committee for Human Rights, in 1996, and Exh. C, which was a copy of an affidavit prepared by Paul Harris, a barrister in Hong Kong, for the *Lui* case. The Magistrate Judge afforded the Government an opportunity to more fully express its position in its post-hearing briefs, but the Government failed to do so. Therefore, defendant's Exhs. A and C may be admitted as full exhibits, for the limited purpose of expressing the opinions of their authors, but not necessarily for the truth of all their contents.

It is well-established that neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure apply in extradition matters. *See Messina v. United States*, 728 F.2d 77, 80 (2d Cir.1984); *Melia v. United States*, 667 F.2d 300, 302 (2d Cir.1981); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir.1980). An extradition-defendant's right to present evidence at an extradition hearing is also severely limited: "As in the case of a grand jury proceeding, a defendant [in an extradition matter] has no right to cross-examine witnesses or introduce evidence to rebut that of the prosecutor." *Messina*, 728 F.2d at 80. Subject to the court's discretion, the extraditee may, at best, introduce explanatory evidence which includes " 'reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause' " *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir.1991) (*quoting Matter of Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y.1978), *aff'd on other grounds*, 619 F.2d 167 (2d Cir.1980)).

Defendant objected, on evidentiary and constitutional grounds, to proceeding in the absence of Government witnesses subject to cross-examination. However, 18 U.S.C. § 3190 specifically provides:

Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be

proof that the same, so offered, are authenticated in the manner required.

As the district court observed in *In re Extradition of Marzook*, 924 F.Supp. 565, 592 (S.D.N.Y. 1996) [*"Marzook I"*], in light of § 3190, "the standard for admissibility of evidence in [an extradition] hearing is not left to judicial discretion," and the court "must accept as true all of the statements and offers of proof by the demanding state," even if they contain hearsay. *See also Cherry v. Reish*, 1996 WL 509735, at *2 (S.D.N.Y. Sept.9, 1996) (relying upon Swiss affidavits and exhibits), *aff'd mem.*, 104 F.3d 355 (2d Cir.1996); *Marzook I*, 924 F.Supp. 565 at 592–93 (relying on translated statements, documents, and audiotapes provided by Israeli government); *In re Extradition of Vukcevic*, 1995 WL 675493, at *1 (S.D.N.Y. Nov.14, 1995) (relying on summaries provided by Swiss government); *In re Extradition of Glantz*, 1995 WL 495644 at *2 (S.D.N.Y. Aug.21, 1995) (relying on summaries and police reports provided by Dutch government); *Lo Duca v. United States*, 1995 WL 428636, at *5–9 (E.D.N.Y. July 7, 1995) (relying on certifications and documents provided by Italian government), *affd. on other grounds, Lo Duca v. United States*, 93 F.3d 1100 (2d Cir.) (Newman, C.J.) (upholding constitutionality of statute), *cert. denied*, —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 399 (1996).

7. Attached as an exhibit to defendant's post-hearing brief (Dkt.# 34) was an eighteen-page computer analysis of the transactions in defendant's Hong Kong bank account from June 1 through August 12, 1994. Three exhibits were attached to the Government's post-hearing brief (Dkt.# 35): copy of proceedings on International Convention on Civil and Political Rights before the United States Senate on April 2, 1992 (Exh. A); copy of proceedings on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment before the United States Senate on October 27, 1990 (Exh. B); and legislative history regarding same (Exh. C).

8. Five exhibits were attached: a Summary Table of Defendant's Transactions (Exh. A); copies of three published decisions from other jurisdictions (Exhs.B–D); and a copy of the 1st Circuit's recent decision in *United States v. Lui Kin–Hong*, 110 F.3d 103 (1st Cir.1997), denying rehearing *en banc*.

the apprehension of the person so charged, that he may be brought before such ... magistrate, to the end that the evidence of criminality may be heard and considered.... If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty, ... he shall certify the same, together with a copy of all testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty.

Last summer, the Second Circuit upheld the constitutionality of this statute. *Lo Duca v. United States*, 93 F.3d 1100 (2d Cir.) (Newman, C.J.), *cert. denied*, —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 399 (1996).

It is well-settled law that a certificate of extraditability may issue:

if the [court] has jurisdiction of the subject-matter and of the accused, and the offence charged is within the terms of the treaty of extradition, and the [court] ... has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition.

*Ornelas v. Ruiz*, 161 U.S. 502, 508–09, 16 S.Ct. 689, 691, 40 L.Ed. 787 (1896); *Bingham v. Bradley*, 241 U.S. 511, 516–17, 36 S.Ct. 634, 637, 60 L.Ed. 1136 (1916); *Ahmad v. Wigen*, 910 F.2d 1063, 1064 (2d Cir.1990) ("the Supreme Court has adhered steadfastly to [this] legal principle for more than a century"). *See also Marzook v. Christopher*, 1996 WL 583378, at *4 (S.D.N.Y. Oct.10, 1996) ["*Marzook II* "].[9] The three requirements for extradition are discussed separately below.

### A. JURISDICTION

At the hearing, defense counsel represented that Cheung does not contest personal jurisdiction, as he was found within the State of Connecticut and arrested on December 26, 1996. He has been incarcerated at the New Haven Correctional Center since his arrest.

Accordingly, this court has personal jurisdiction over Cheung.

### B. THE EXTRADITION TREATIES
### 1. IDENTITY OF THE TREATIES

At the present time, there is an extradition treaty in full force and effect between the United States and Hong Kong, as follows: There is an applicable treaty between the United States and the United Kingdom of Great Britain and Northern Ireland found in the 1972 Extradition Treaty [the "Treaty"], Protocol of Signature and Exchange of Notes between the United States of America and the United Kingdom of Great Britain and Northern Ireland, which became effective on January 21, 1977 ["Tias 8468"]. The Treaty and TIAS 8468 are made applicable to Hong Kong by an exchange of notes in Washington, D.C. on October 21, 1976 and the Supplementary Treaty of June 25, 1985 [the "Supplementary Treaty"], which became effective on December 23, 1986, also made applicable to Hong Kong in the Annex to the Supplementary Treaty. Cheung admits the existence of the extradition treaty between the United States and the United Kingdom, and that it presently extends to Hong Kong. (Dkt. # 28, at 2).

### 2. EXTRADITABILITY UNDER THE TREATIES

The next question is whether the charges against Cheung are extraditable under the terms of the treaty agreements. At the hearing held on March 26, 1997, defense counsel similarly represented that Cheung does not contest that the Hong Kong statutes with which he has been charged, thirty-three counts ("offences") of obtaining property by deception, in violation of Section 17(1) of the Theft Ordinance, Laws of Hong Kong, and

9. In an ironic twist of fate, particularly concerning the timing of these proceedings, earlier this month, the Israeli government suspended its extradition request for Marzook, for fear that his trial in Israel would disrupt the already floundering peace negotiations and provoke additional retaliatory attacks by Hamas; he is now in the custody of the United States Immigration and Naturalization Service. Hoffman, *A Mideast Dilemma: U.S. Courts, Third World Law*, N.Y. TIMES, April 13, 1997, at § 4, 4.

one count of evasion of liability by deception, in violation of Section 18(B)(1)(b) of the Theft Ordinance, Laws of Hong Kong, fall within the terms of an applicable treaty, if any.

### 3. ISSUES RELATED TO REVERSION

#### a. POTENTIAL LAPSE OF TREATY

Defendant correctly contends that his extradition can only occur pursuant to a valid and enforceable treaty between the United States and the requesting party. *Factor v. Laubenheimer*, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933). Defendant further contends that because neither the extradition proceedings nor the trial and punishment of Cheung can be completed before Hong Kong's reversion to the People's Republic of China ["PRC"] on July 1, 1997 [10], his extradition is improper. In other words, because the treaty could lapse before the occurrence of these events, defendant contends that extradition "would violate the terms of the treaty as an impermissible extradition to the PRC." (Dkt. # 28, at 5). Cheung views the issue as a jurisdictional one. *Id.*

Many of the arguments made by defendant here with respect to the impending reversion were made by the defendant in *Lui Kin–Hong v. United States*, 957 F.Supp. 1280 (D. Mass.1997) [*"Lui I"*]. Indeed, Cheung's pre-hearing memorandum cites *Lui I* extensively. On March 20, 1997, the United States Court of Appeals for the First Circuit reversed the grant of habeas corpus by the District Court in *Lui I. United States v. Lui Kin–Hong*, 110 F.3d 103 (1st Cir.1997) [*"Lui II"*].[11] The rejection of *Lui I* by the First Circuit is discussed more fully below.[12]

■ In his pre-hearing memorandum, Cheung claims that if this court certifies his extradition, he "will avail himself of the habeas process ... [which] would take several months to complete ... [f]ollow[ed][by] ... an appeal to the Second Circuit ... followed by the filing of a certiorari petition." (Dkt. # 28, at 3). According to Cheung, this *"procedural reality* ... counsels in favor of this Court denying Cheung's extradition." *Id.* at 4 (emphasis added). The procedural reality of extradition, however, is governed by statute, 18 U.S.C. § 3184, which is mandatory in the nature of the certification procedure. Thus, when the person to be extradited is apprehended, "he may be brought before such ... magistrate to the end that the evidence of criminality may be heard and considered ... If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, ... he *shall* certify the same,

---

**10.** The United Kingdom's ninety-nine year lease will expire in accordance with the Joint Declaration.

**11.** Lui's petition for rehearing *en banc* was denied on April 10, 1997. 110 F.3d 103, 121–32. *See also* note 15 *infra.* Lui's request for a stay from U.S. Supreme Court Justice David Souter was also denied and a renewed petition was filed on April 15, 1997.

**12.** *Lui II* could be distinguished on the grounds that (1) this is the Second Circuit, with its own extradition jurisprudence; and, (2) the reversion issues here are to be considered by the court in closer temporal proximity than in *Lui II.* With respect to the former, the Circuits are not significantly different with respect to the principles of non-1nquiry, reciprocity, and other issues discussed *infra. Cf. Lui II*, at 112 (the First Circuit, "like the Second Circuit, 'can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle[s]' [of non-inquiry, reciprocity and the like]") (*citing Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.), *cert.*

*denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960)).

With respect to the latter, if a court were to read the terms of the Treaty as to require trial and punishment by the same government which gave the Treaty assurances, "we would be forced to conclude that any relator extradited from the United States to Hong Kong at any point since the signing of the Joint Declaration, was, if he faced a term of imprisonment upon conviction that could conceivably extend past the date of reversion, sent to Hong Kong in violation of the Treaty." *Lui II*, at 116; *Oen Yin–Choy v. Robinson*, 858 F.2d 1400, 1404 (9th Cir.1988) ("Were the Treaty to be interpreted as [defendant] asks, extradition to Hong Kong would be the exception rather than the rule ... limited in practice only to extradition for crimes which could be punished for a term expiring before the reversion date"), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989). In other words, many of defendant's arguments, as they relate to proximity of the reversion, are simply misplaced. This does not mean, however, that the court is taking a blind eye to Cheung's potential plight. *See* SectionI.B.3.e. *infra.*

together with a copy of all the testimony taken before him, to the Secretary of State." *Id.* (emphasis added). Thus, there is nothing in the statute which would warrant non-certification on the basis of anticipated appeals. Moreover, there is nothing in the Treaty or the Supplementary Treaty which provides for non-certification under these circumstances. *See Lui II,* 110 F.3d at 109 ("Indeed, the Supplementary Treaty is entirely silent on the question of reversion" notwithstanding "United States Senate ratification of the Supplementary Treaty ... well after the widely publicized signing of the Joint Declaration").

█ In addition, several applicable principles of extradition law operate to defeat the defendant's reversion arguments. First is the principle that "extradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement because they are 'in the interest of justice and friendly international relationships.'" *Lui II,* at 110 (*citing Factor,* 290 U.S. at 298, 54 S.Ct. at 197). The principle of reciprocity is intertwined with liberal construction. Reciprocity relates to the bilateral nature of the treaties between the United States and Hong Kong. "The United States has sought extradition of criminals from Hong Kong in the past, and may wish to continue to do so up until July 1, 1997.... [I]f this court were to read a cut-off date vis-a-vis extraditions to Hong Kong into the Treaties, it would risk depriving both parties of the benefit of the bargain." *Lui II,* at 112. Indeed, as Government's counsel pointed out, "[d]espite the long-anticipated transfer of power over to Hong Kong, neither party to the U.S.-U.K. treaty has chosen to exercise its rights under the treaty's termination clauses to terminate the treaty or its application to Hong Kong." (Dkt. # 17, at 4).

Moreover, the future events which are predicted by Cheung may not come to pass at all. There is a possibility that the new extradition treaty between the United States and Hong Kong Special Administrative Region ["HKSAR"] could be ratified by Congress before the July 1, 1997 reversion. *Lui II,* at 111–12; Dkt. # 17 & Exh. A thereto (copy of the Declaration of Jamison Borek, Deputy Legal Advisor, Department of State). In the alternative, President William J. Clinton may choose to extend the current Treaty by executive agreement.[13] In any event, "[a]ll of these questions involve an evaluation of contingent political events" containing many ingredients of a non-justiciable political question. *Lui II,* at 111–12. Coupled with the fact that there is a "statutory scheme which provides for the resolution of these questions by an identified member of the executive branch ... [t]he case for judicial resolution [of these questions] is thus weaker than with many such questions." *Id.*

█ Finally, the rule of non-inquiry prohibits the extradition magistrate "from examining the requesting country's criminal justice system or taking into account the possibility that the extraditee will be mistreated if returned." *In re Extradition of Sandhu,* 886 F.Supp. 318, 321 (S.D.N.Y.1993) (citation omitted) (rule of non-inquiry applied to extradition to India). The rule of non-inquiry is well-established in the circuits and has been applied in extraditions to a panoply of nations. *Martin v. Warden, Atlanta Pen.,* 993 F.2d 824 (11th Cir.1993) (Canada); *Koskotas v. Roche,* 931 F.2d 169 (1st Cir.1991) (Greece); *Quinn v. Robinson,* 783 F.2d 776 (9th Cir.) (U.K.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); *Eain v. Wilkes,* 641 F.2d 504 (7th Cir.) (Israel), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Escobedo v. United States,* 623 F.2d 1098 (5th Cir.) (Mexico), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980); *Peroff v. Hylton,* 563 F.2d 1099 (4th Cir.1977) (*per curiam*) (Sweden); *Gallina v. Fraser,* 278 F.2d 77 (2d Cir.) (Italy), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960).

█ In 1960, the Second Circuit left open the possibility of judicial inquiry in cases where "the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle [of non-inquiry]." *Gallina,*

---

**13.** Arguments against this alternative are not ripe for judicial resolution as merely a "hypothetical ... dispute between the legislature and the executive." *Lui II,* at n. 14.

278 F.2d at 79 (dicta). However, more recently, the Second Circuit definitively foreclosed such review by a habeas corpus judge, and cast serious doubt on the viability of such review even by the certifying judicial officer. *Ahmad,* 910 F.2d at 1066.[14]

The *"Gallina* exception" to the rule of non-inquiry has yet to be applied. Moreover, since *Gallina,* courts have not only consistently upheld the rule of non-inquiry, but have also repeatedly ordered extradition despite allegations of serious conditions that might face the extraditee. *See, e.g. Linnas v. INS,* 790 F.2d 1024 (2d Cir.) (allegation that subject of deportation proceedings faced death sentence and absence of due process), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986); *Escobedo v. United States,* 623 F.2d 1098 (5th Cir.)(allegation that extraditee faced torture and murder if returned to the requesting state), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980); *Sindona,* 619 F.2d at 174 (allegation that extraditee faced risk of murder or injury at the hands of his political enemies).

*Sandhu,* 886 F.Supp. at 322 (refusing request to present evidence on the conditions extraditee would face).

More than just a principle of treaty construction, the rule of non-inquiry tightly limits the appropriate scope of judicial analysis in an extradition proceeding. Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country. The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. It is not that questions about what await the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom

these questions are more properly addressed.

*Lui II,* at 110–11 (citations omitted) (footnote omitted).

Accordingly, specific arguments related to the reversion of Hong Kong addressed below will be discussed in light of the foregoing principles.

### b. SPECIFIC PROVISIONS OF THE TREATIES

Cheung argues that the language of certain Treaty provisions does not permit this court to certify extradition because it would, in essence, be impermissibly certifying extradition to the PRC. (Dkt. # 28, at 5). This magistrate judge concludes, as did the panel in *Lui II,* that "the obligation of the United States to extradite [the defendant], specified in article I of the Treaty, is not undermined by any of these provisions. We base our analysis on the plain language of the Treaty. Underlying this analysis is the court's awareness of the limited role of the judiciary in extradition proceedings." *Lui II,* at 113.

### (i) POLITICAL OFFENSE

■ Treaty Article V(1)(c) provides that "[e]xtradition shall not be granted if: ... (I) the offense for which extradition is requested is regarded by the requested party as one of a political character; or (ii) the person sought proves that the request for his extradition has in fact been made with a view to try and punish him for an offense of a political nature." Article 1 of the Supplementary Treaty provides that certain "crimes of violence" shall not be regarded as offenses of political character. *See Lui II,* at 114–15. Article 3(a) of the Supplementary Treaty provides that no extradition shall occur if the request is made with a view to try or punish a defendant on account of "his race, religion, nationality, or political opinions." Nor may the person sought be extradited if he would be "prejudiced at his trial, or punished, detained or restricted in his political liberty" by reason of the same.

---

**14.** *Gill v. Imundi,* 747 F.Supp. 1028, 1049–50 (S.D.N.Y.1990) held, in dicta, that it "may be so" that the extradition magistrate could appropriately consider "the conditions to which an extraditee may be subjected in the requesting nation" under *Ahmad.* This judicial officer does not read *Ahmad* so broadly.

Cheung argues that the "Political Offense Exception ... expressly states that extradition, trial and punishment of a relator must occur under the requesting party's sovereignty." (Dkt. # 28, at 6–7). However, as the First Circuit observed with respect to the bribery charges against Lui, the Political Offense Exception "is simply inapplicable here." *Lui II*, at 114. It "is available only to fugitives charged with one of the crimes specified in article I of the Supplementary Treaty, all of which are crimes of violence." *Id.* Here, Cheung has been charged with thirty-three counts of obtaining property by deception and one count of evasion of liability by deception, crimes which are not specified in the Supplementary Treaty. Accordingly, the Political Offense Exception will not operate to prevent extradition.

Cheung also argues that Article 3(a) "must be read to authorize judicial inquiry into the motive of the requesting sovereign." Again, however, the First Circuit responded to this same argument regarding the scope of the inquiry under the Article 3(a) defense. "[A]rticle 3(a) allows the judicial officer to make only a narrowly circumscribed inquiry. '[A]n extradition target must establish by a preponderance of the evidence that, if he were surrendered, the legal system of the requesting country would treat him differently from other similarly situated individuals because of his race, religion, nationality, or political opinions.'" *Lui II*, at 115 (*citing In re Extradition of Howard*, 996 F.2d 1320, 1331 (1st Cir.1993)). This magistrate judge will not "exceed[ ] the narrow inquiry permitted by Article 3(a)" by "making its own predictions about the post-reversion justice system in Hong Kong." *Id.* Since Cheung makes no showing of discrimination, the political offense exception will not prevent extradition.

## WARRANT, DUAL CRIMINALITY AND SPECIALTY PROVISIONS

Cheung contends that the Warrant, Dual Criminality and Specialty Provisions of the Treaty underscore the idea that the relator may be extradited only if he is charged, tried, judged or punished in the United Kingdom or one of its territories. (Dkt. # 28, at 10–13). As stated above, "the obligation of the United States to extradite Lui ... is not undermined by any of these provisions." *Lui II*, at 113. For example, the Warrant Requirement serves "to do nothing more than help the judicial officer ... confirm that there are in fact charges properly pending against the relator ... and that the relator is actually the person sought." *Id.* Cheung does not attack the warrant requirement on any such grounds, and therefore this magistrate judge finds that the warrant requirement is satisfied.

"The purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries." *Id.* at 114. "The dual criminality requirement, by its plain terms, is satisfied if the crime of which the relator is accused appears on the annexed Schedule or is punishable in both countries by at least one year's imprisonment." *Id.* at 114. The offenses of obtaining property by deception and evasion of liability by deception are covered by Article III of the Treaty and item 17 of the Schedule annexed to it. (*See* Dkt. # 12, Exh. A (Declaration of Sally Cummins & Note 125, dated Oct. 29, 1996, at 4)). Accordingly, the dual criminality requirement is met.

The rule of specialty has two basic requirements: (1) that the relator be tried for the crimes charged in the extradition warrant, and (2) that the relator not be re-extradited to another country. *Lui II*, at 115–16. Cheung argues that this section "'demonstrates once again that the Treaty allows only for extradition for offenses that can be tried and punished by the [United Kingdom].'" (Dkt. # 28 at 12, *citing Lui I* ). This magistrate judge holds that "the rule of specialty literally has no application here." *Lui II*, at 115, *See also* n. 13 *supra*.[15]

### c. DOCTRINE OF STATE SUCCESSION

Cheung argued at considerable length in his pre-hearing memorandum that

---

**15.** On April 10, 1997, a majority of the First Circuit summarily denied a "suggestion" that the court conduct a rehearing *en banc* in *Lui II*. Circuit Judge Norman H. Stahl wrote a dissent from the denial of rehearing *en banc*, concluding that the "numerous difficult and complex questions of law ... warrant the full court's consideration." *Id.* at 121. One such question for Judge

"extradition to post-reversion Hong Kong would amount to an impermissible extradition to the PRC," especially "where extradition, trial and punishment cannot be completed prior to reversion." (Dkt. # 28, at 13–15). As stated above, there is a possibility that timely government action extending the old Treaty to apply to post-reversion Hong Kong, or ratifying an entirely new one, could result in continuous authority to extradite fugitives from Hong Kong. The court may not speculate as to what may happen in the future with respect to relations between the various countries. In addition, "[t]he government does not argue that, absent any other action and of their own accord, the Treaties would continue beyond reversion to apply to Hong Kong. Accordingly, on the facts of this case, we find the discussion of the state succession doctrine in *Tenderlin v. Ames* ... to be of little assistance." *Lui II*, at n. 13. Of course, Cheung is free to present this argument to the Secretary of State.

### d. SEPARATION OF POWERS

 Under our Constitution, the Executive Branch ordinarily initiates negotiations of treaties with foreign governments, which become law only with the advice and consent of the Senate. Cheung argues that the logical corollary to this constitutional mandate is "that this Court should refrain from rendering a decision that would effectively encroach on the authority of both branches to determine jointly whether the PRC-controlled Hong Kong will provide a sufficiently fair and humane system to qualify as the United States' extradition partner." (Dkt. # 28, at 21–22). More particularly, Cheung argues

that the Senate has already explicitly declared that it would not extend the Treaty to the PRC.

Again, however, this Court must apply the law as it currently exists. *See* n. 13 *supra* and accompanying text. The Supplementary Treaty was ratified at a time when reversion was well-publicized and well-anticipated. The political branches approved the Supplementary Treaty. The procedural mechanism of § 3184 mandates that if all the other requirements are met, the judicial officer shall certify that the relator may be extradited. Contrary to Cheung's argument that to certify extradition would unconstitutionally usurp the Senate's prerogative, the *failure* to certify extradition in a proper case would be contrary to the intent of the political branches, and, in fact, would unconstitutionally impinge on the Secretary of State's final decision-making authority:

> The larger assessment of extradition and its consequences is committed to the Secretary of State. This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch. Both institutional competence rationales and our constitutional structure, which places primary responsibility for foreign affairs in the executive branch support this division of labor.

*Lui II*, at 110 (citation omitted).

### e. DUE PROCESS

It is not surprising that, in light of the holding in *Lui II*, the parties have focussed

---

Stahl was whether reversion "would effect an impermissible re-extradition" of Lui in contravention of Article XII of the Treaty. He based his analysis on the plain meaning of the word extradition. This court is not convinced that an analysis of the plain meaning of the term "extradition" goes a long way in resolving the situation at hand. That is because it is doubtful that the treaty drafters included Article XII to apply to a situation such as the reversion of Hong Kong. Moreover, even if Judge Stahl is correct in his analysis of the plain meaning of extradition, he overstates the role of the courts under the extradition statute. Judge Stahl interprets the Treaty provisions alone to mean that extradition "may

occur only if the United Kingdom or authorities accountable to it retain exclusive jurisdiction over [the relator's] person following Hong Kong's reversion to China." *Id.* Such an interpretation would appear to require the court to seek assurances from the United State's treaty partner, something that is beyond the scope of its authority under the extradition statute. *Lui II*, at 115–16 (*citing U.S. v. Saccoccia*, 58 F.3d 754, 766–67 (1st Cir.1995)). *See Terlinden v. Ames*, 184 U.S. 270, 288, 22 S.Ct. 484, 491, 46 L.Ed. 534 (1902) ("the question whether power remains in a foreign State to carry out its treaty obligations is in its nature political, not judicial").

more attention to the issues left open by the First Circuit. For example, Cheung argues that, due to the timing of the extradition request and the impending reversion of Hong Kong, that he will "most likely" be denied his due process rights. In addition, he could be subjected to inhumane treatment, torture and possibly execution. He argues that these possible outcomes are in contravention of Articles 6 and 14 of the International Covenant on Civil and Political Rights ["ICCPR"], as well as Article 3 of the Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment ["Convention Against Torture"]. (Dkt. # 28, at 24). In addition, Cheung argues that the possibility of extradition to a territory ultimately controlled by the PRC would contravene customary international law. *Id.* For the proposition that the PRC's criminal procedures "fall short" of the standards enunciated in the ICCPR, Cheung cites reports by the U.S. State Department, Amnesty International, and the Lawyers Committee for Human Rights.

From a factual perspective, Cheung contends that there is a growing number of people who have been put to death in the PRC for nonviolent economic offenses similar to those Cheung is accused of committing. In addition, Cheung argues that he will be targeted by the PRC because he allegedly defrauded Chinese-based suppliers, thereby giving the PRC a "direct reason" to seek punishing Cheung under their law. Moreover, Cheung argues that there are the "strong grounds" to believe Cheung would be subjected to torture, either to coerce a confession or to punish Cheung. *Id.* at 28. Finally, Cheung also argues that the rule of non-inquiry does not apply because, while the rule prevents investigation into the fairness of the requesting nation's justice system, "it cannot and does not bar the court from giving due value to co-existing treaties." *Id.* at 27.[16]

The Government counters that Cheung has failed to prove a sufficient factual basis for

his claims, pointing out that he merely suggests that the PRC is an autocratic regime. The Government points out that there is no evidence that Cheung will be singled out personally or that there is any animus directed at Cheung by the PRC. In addition, there is no death penalty under current Hong Kong law. Finally, the Government points out that Cheung's crimes are not political in nature.

Besides being factually insufficient, the Government claims that Cheung's arguments are legally meritless. Treaty rights, according to the Government, are not personally enforceable and the treaties in question are not self-executing. Counsel for the Government points out that in the ratification of the cited treaties, the Senate explicitly made the treaties non-self-executing. And as for customary international law, the Government claims that the extradition treaty "preempts" customary international law. Because the extradition treaty contains no right of a relator to contest extradition on the basis of treatment in the requesting country, none should be permitted. Moreover, since the rule of non-inquiry reserves to the Secretary of State the right to take the above-mentioned issues into consideration, that customary international law will not apply here.

▆▆▆▆ This judicial officer agrees with the Government's position that, on a factual basis, Cheung has failed to make a sufficient showing that he will be singled out for torture or death. The Court is well aware of the perception that criminals in China are *generally* not accorded the same due process rights as criminals in the United States. However, the same can be said of many, if not most, of the countries throughout the world. The factual proof offered by Cheung outlined above meets neither the "substantial grounds" nor the "more likely than not" standard of proof with respect to the Convention Against Torture. Cheung's conclusory allegation that "the evidence shows that there are strong grounds for believing that [he]

---

**16.** In his post-hearing memorandum, Cheung argues three separate grounds for judicial review of the "human rights issue:" (1) the plain language and legislative history of the ICCPR authorize refusal of certification; (2) the norm of *jus*

*cogens* mandates a refusal to extradite; and (3) Treaty and Supplementary Treaty language and legislative history prohibit extradition where the relator would be subject to torture or cruel, degrading and inhumane treatment. (Dkt.# 37).

would be subjected to torture . . . if returned to Hong Kong" is not backed by any set of logically connected facts. It is true that Cheung is alleged to have defrauded Chinese-based creditors, an economic crime. Even assuming that the PRC has sentenced people to death for a variety of nonviolent economic offenses, there is no proof that the sentence was imposed based upon the nationality of the victim, the PRC's "direct reason" to punish the accused, or the economic nature of the crime itself. There is certainly no proof of animus directed at Cheung personally. Indeed, there is no proof that the PRC is even aware that Cheung might possibly come under their jurisdiction. Accordingly, this judicial officer holds that Cheung has failed to make a sufficient factual showing with respect to denial of due process rights.[17]

In addition, even if a sufficient factual showing was made,

> [i]t is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds. So far as we know, the Secretary never has directed extradition in the face of proof that the extraditee would be subjected to procedures or punishment antipathetic to a federal court's sense of decency. Indeed, it is difficult to conceive of a situation in which a Secretary of State would do so.

*Ahmad,* 910 F.2d at 1067 (citations omitted).

The court is mindful of the general allegations of abuses by the regime in power in the PRC. The court respectfully directs the attention of the Secretary of State Madeline K. Albright to the various exhibits attached to and referenced in Cheung's submissions to the court. The court is most concerned that

Cheung's fate may well be viewed as minor in relation to the upheaval about to take place in Hong Kong and the attendant foreign policy implications. This court does not view Cheung's fate as minor at all. And thus, while this judicial officer's role is limited under the extradition statute and corresponding case law, she is also mindful of the due process arguments raised by Cheung. It would be unfortunate, to say the least, if Cheung's basic rights were violated on the altar of world affairs. Accordingly, this judicial officer strongly urges the Secretary of State to appropriately consider all Cheung's arguments carefully, and to tailor any extradition order appropriately.

## C. PROBABLE CAUSE

■ As Chief Judge Newman explained in *Lo Duca:*

> The extradition hearing conducted pursuant to section 3184 . . . is "essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation." As the Supreme Court has stated, "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." The judicial officer who conducts an extradition hearing "thus performs an assignment in line with his or her accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense."

Similarly, this magistrate judge is not persuaded by Cheung's argument that customary international law requires considerations of freedom from torture above all else. (Dkt. # 28, at 27). Only "where there is no treaty, and no controlling executive or legislative act or judicial decision" will resort be made to customary international law. *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). Since there is a treaty that provides for the conditions under which a relator may contest extradition, customary international law will not apply. This is especially true in light of the rule of non-inquiry.

---

**17.** Even if there were sufficient factual grounds, Cheung's reliance on the ICCPR and the Covenant Against Torture will not prevent extradition. As counsel for the Government points out, " '[i]t is only when a treaty is self-executing, when it prescribes rules by which private rights may be determined, that it may be relief for enforcement of such rights.' " (Dkt. # 35, at 2, *citing Dreyfus v. Von Finck,* 534 F.2d 24, 29–30 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976)). As stated above, both treaties were ratified with the express proviso that they were *not* self-executing. (*See* Dkt. # 35, at 3.) Since Congress has not enacted any implementing legislation, Cheung may not rely on them to avoid extradition.

93 F.3d at 1104 (*quoting Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922)) (other citations omitted). In this context, "[a] finding of probable cause requires only that there be evidence 'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" *Marzook II,* 1996 WL 583378, at *5 (citation omitted). Article 2 of the Supplementary Treaty specifically defines "probable cause" to mean that "there is sufficient evidence to warrant a man of reasonable caution in the belief that: ... (1) the person arrested ... is the person sought; [and] (2) in the case of a person accused of having committed a crime, an offense has been committed by the accused." *See also* Treaty Art. XII ("A person extradited shall not be detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted...."); *Austin v. Healey,* 5 F.3d 598, 605 (2d Cir.1993) (upholding extradition order despite fact that England's evidence was "circumstantial, and less than overwhelming," but noting that "the foreign government is not required to present its entire case in this country" and that the "evidence presented need only support a reasonable belief that [defendant] was guilty of the crimes charged"), *cert. denied,* 510 U.S. 1165, 114 S.Ct. 1192, 127 L.Ed.2d 542 (1994).

■ At the hearing held on March 26, 1997, defense counsel represented that defendant does not contest identity, and both counsel agreed that the Magistrate Judge must examine and make independent findings as to the question of probable cause for each and every one of the Government's thirty-four counts. The Government's evidence was as follows: From 1985 through August 14, 1994, Cheung operated A–1 Electronics Company ["A–1"] which carried on business in Hong Kong as a retail supplier of computers and computer accessories; A–1 maintained three retail stores. (Exh. 2, at 664–69, 671–79, 216, 244, 388–89; Exh. 3, at 862). During 1992 and 1993, Cheung and his family traveled frequently to the United States. (Exh. 2, at 667, 673).

As part of its regular business dealings, A–1 received computer equipment from wholesale suppliers on credit between fourteen and forty-five days, by means of postdated checks signed by Cheung on behalf of A–1. (Exh. 3, at 665). Cheung does not dispute that A–1 had been undercapitalized since its inception, and overdrafts and bounced checks were not an uncommon occurrence. (Dkt. # 34, at 7, ¶ 2). A–1 maintained three business bank accounts from which it made payments to suppliers: (1) American Express Bank Account No. 930004129 ["American Express Account"], (2) Kincheng Bank Account No. 030–556–00–74478 ["Kincheng Account"], and (3) Shanghai Commercial Bank ["Shanghai Account"]; the American Express Account had an overdraft facility of $90,000, and Cheung and his wife were signatories on all three accounts. (Exh. 2, at 665; Exh. 3, at 725–32, 794–805, 858–71). The Shanghai Account was inactive from 1990 until July 28, 1994. (Exh. 3, at 862, 869). However, from September 1, 1985 through December 31, 1985, the Shanghai Account frequently was in overdraft status. (Exh. 3, at 927–37).

From June 10, 1994 until August 14, 1994, A–1 accumulated HK $1,957,629 in debt to fifteen suppliers of computers and related accessories: IBM China/Hong Kong Corporation ["IBM"], Microware USA Ltd. ["Microware"], Jardine Systems Products ["Jardine"], Worldstar International (HK) Ltd. ["Worldstar"], System Pro–Computer Ltd. ["System–Pro"], Pure Success Ltd. ["Pure"], Chevalier (OA) Ltd. ["Chevalier"], Asian Electronics Ltd. ["Asian Electronics"], Vtech Computer systems Ltd. ["Vtech"], Asian Instruments (Far East) Ltd. ["Asian Instruments"], Tech Pacific (HK) Ltd. ["Tech"], Toppan Moore Computer Systems Ltd. ["Toppan"], Able Systems Development Ltd. ["Able"], Flourish Computer (HK) Co. Ltd. ["Flourish"], and Viewking Trading Ltd. ["Viewking"]. From June through August 1994, Cheung issued numerous checks which were postdated for after his departure from Hong Kong on August 14, 1994. (Exh. 3, at 730–31, 800–03). In mid-July 1994, Cheung was the sole employee to make decisions regarding placing orders for goods and prohibited all other A–1 employees from placing such orders; one of his branch managers

noticed an unusual reduction in retail stock during this time period, as well as curious shipments to the Phillippines. (Exh. 2, at 666). On August 12, 1994, Cheung appeared at the American Express Bank to close out A–1's bank account, on which several post-dated checks had been issued; the account was closed upon defendant's payment that day of HK $85,157.92 in cash to settle the existing overdraft debt owed by A–1 to the bank. (Exh. 3, at 729).[18]

While Cheung was depleting his American Express Account and Kincheng Account, he began to accumulate funds in his dormant Shanghai Account. Commencing on July 29, 1994, Cheung began to make a series of large check deposits and transfers to the account, with corresponding cash withdrawals. On July 29, 1994, he withdrew HK $20,000; on August 4 and 5, 1994, he transferred U.S. $16,000 to a Bankers Trust Company account in New York City. On August 8, 9, and 11, 1994, he withdrew, on a daily basis, HK $100,000 in cash. On August 11, 1994, he transferred HK $50,000 to his mother-in-law's account at an affiliated institution. On August 12, 1994, he withdrew another HK $20,000 in cash. On August 13, 1994, Cheung withdrew an additional HK $150,000 in cash from this account. Additional sums were subsequently transferred to his mother-in-law's account. (Exh. 3, at 862–69, 1117–18). In sum, over a seventeen-day period, from July 28, 1994 until August 3, 1994, he deposited a total of HK $1,077,546 into the Shanghai Account, withdrew HK $850,000 in cash, and transferred $16,000 (approximately HK $123,892) to his New York bank account.

On June 27, 1994, while Cheung, his wife, and two of their sons were visiting in Toronto, they purchased, through a Toronto travel agency, round-trip tickets from Toronto to Hong Kong and back. (Exh. 4, at 1160–61). On August 14, 1994, Cheung, his wife, and their three sons departed Hong Kong, without notice, even to A–1's employees, using the "return ticket" to Toronto, with approxi-mately four hundred pounds of luggage. (Exh. la, at 52, 134; Exh. 3, at 667, 673, 678, 686, 745; Exh. 4, at 1159–61, 1206–07, 1235, 1255, 1260). On the morning of August 16, 1994, a person identifying himself as Cheung's brother told A–1's branch managers that Cheung and his family had permanently left Hong Kong and that all three branches of A–1 would be closed. (Exh. 2, at 667, 673, 678). A consequent search of the three branches failed to uncover any significant quantity of electronics merchandise, and in particular, failed to uncover any of the goods at issue in these charges. (Exh. 3, at 691–92),

### 1. IBM—CHARGES 1–4, 8–9, 13, 18, 28

A–1 began to order computer and computer accessories from IBM in March 1993. (Exh. 2, at 143–50, 151–97). Cheung personally ordered the goods, paid for by checks postdated for forty-five days after delivery. (Exh. 2, at 143–47, 512, 522, 534, 539, 547). Commencing on June 3, 1994 through August 5, 1994, A–1 made nine orders and took deliveries from IBM, totaling U.S. $34,197 (or HK $266,736.60). (Exh. 2, at 147, 152–96). In early August 1994, IBM telephoned A–1, when all nine bills were outstanding; Cheung informed IBM that he was suffering from a "cash squeeze" but promised to make payment as soon as possible. (Exh. 2, at 148–49). On August 16, 1994, IBM learned that A–1 had closed business, and has not been paid. (Exh. 2, at 149).

As previously mentioned, on June 27, 1994, Cheung purchased round trip airline tickets for him and his family in Toronto and flew from Hong Kong on August 14, 1994, on the "return" portion of these tickets, with approximately four hundred pounds of luggage. Therefore, there is no difficulty in finding an intent to leave Hong Kong on a permanent basis as of June 27, 1994, at the latest. Three of these charges (Charges 13, 18, 28) occurred after this date.

---

**18.** In a post-hearing brief, defendant argues that there would have been "absolutely no reason to walk into the American Express Office and voluntarily pay" more than HK $85,000 to close this account, if he were planning to abscond. (Dkt. # 34, at 8–9). However, as the Government ap-propriately has observed, it is equally logical to question why Cheung was closing the American Express Account at all, one which defendant described as his "princip[al] business account." (Dkt. # 38, at 3, *quoting* Dkt. # 34, at 8).

According to the analysis found as Exh. A to Dkt. # 34, on June 3–4, 1994, when the first three orders were placed (Charges 1–3), HK $277,000 was deposited in A–1's American Express Account and HK $450,000 was withdrawn. From this, defendant argues that the Court cannot find any "false representations" by Cheung and/or intent to permanently deprive IBM of these goods without paying for them. Defendant is correct that "[a]n unpaid business debt does not make a crime" (Dkt. # 34, at 13), but even as of early June 1994, it was clear that A–1 was having serious financial difficulties. The middle three charges (Charges 4, 8, 9) occurred on June 8, 17, and 18, within two to three weeks of defendant's purchase of the round trip airline tickets in Toronto. There is no question that the Government has amply sustained its burden with respect to the July and August charges.

Even as to the June charges, the Government has satisfied its limited burden. Like *Austin*, 5 F.3d at 605, the Government's evidence regarding the June charges is "circumstantial, and less than overwhelming," but as in *Austin*, the Hong Kong government "is not required to present its entire case in this country" and the "evidence presented need only support a reasonable belief that [defendant is] guilty of the crimes charged." As the Government has indicated, more than two-thirds of all the charges relate to debts incurred in the period from July 18, 1994 until August 14, 1994, and virtually all of them involved the issuance of checks postdated *after* August 14, 1994. (Dkt. # 38, at 5, n. 1 & Exh. A). *See also United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir.1990) ("subsequent similar act was significant in establishing [defendant's] state of mind at the time of the charged offense").

In addition, probable cause exists to believe that Cheung engaged in unlawful "deception," "by word or *conduct*," under Laws of Hong Kong, Theft Ordinance, §§ 17(1) & (4). *See also State v. Williams*, 134 Ariz. 411, 656 P.2d 1272, 1277 & n. 5 (App.1982) (affirming larceny-by-deception convictions from use of worthless checks and distinguishing *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982)); *Peo-*

*ple v. Young*, 130 Ill.App.3d 117, 85 Ill.Dec. 375, 376–77, 473 N.E.2d 974, 975–76, *cert. denied*, 474 U.S. 833, 106 S.Ct. 104, 88 L.Ed.2d 85 (1985) (same); *People v. Halloran*, 131 Misc.2d 901, 501 N.Y.S.2d 985, 990–91 (Sup.Ct.1986) (same).

### 2. *MICROWARE—CHARGES 5 & 34*

A–1 began to order computer and computer accessories from Microware in 1992, to the attention of Cheung; the agreed terms were payment within thirty days of delivery. (Exh. 2, at 198–205, 206–14). On June 9, 1994, A–1 ordered goods from Microware in the amount of HK $115,415, paid for by a check on the American Express Account, postdated for July 15, 1994. (Exh. 2, at 201–03, 552). On August 10, 1994, the check was dishonored; when confronted in person, Cheung issued another check, postdated for August 19, 1994, on A–1's Kincheng Account. (Exh. 2, at 203–04, 209). On August 16, 1994, Microware learned that A–1 had closed, and the replacement check also did not clear. (Exh. 2, at 203–04).

As previously discussed in Section I.C.1. *supra*, the Government has more than adequately sustained its burden with respect to the August charge (Charge 34). With respect to the June charge (Charge 5), defendant again argues that on June 10, 1994, A–1 engaged in ten transactions in its American Express Account, with a balance high of HK $144,742.64 and a balance low of HK $66,288.09. Cheung also contends that had Microware presented the check on various dates prior to August 2, 1994, the check would have been honored. Again, as with the IBM charges, given that this transaction occurred within three weeks of the purchase of the airplane tickets, the Government has satisfied its limited burden.

### 3. *JARDINE—CHARGES 6, 7, 10, 14, & 19*

Jardine began to trade with A–1 in 1990; the agreed terms of credit were payment in full within thirty days of delivery of goods, and Jardine often made visits to Cheung to collect on its payments. (Exh. 2, at 215–22). A–1 placed five separate orders (including computers, color printers, and printer acces-

so:nes), and took delivery thereof, on June 15, June 16, June 20, July 20, and July 25, 1994; Cheung personally signed each of these invoices, the total value for which was HK $627,600. (Exh. 2, at 218–20, 223–41, 557, 576). In early August 1994, Jardine went to Cheung, who tried, unsuccessfully, to place more orders. (Exh. 2, at 220). On August 15 and 16, 1994, Jardine learned that A–1 had closed and the bills remained unpaid. (Exh. 2, at 220–21).

Again, the last two charges (Charges 14 & 19) occurred on July 20 and July 25, 1994, after Cheung purchased the airline tickets in Toronto. The three other charges (Charges 6, 7, & 10) took place within one to two weeks of this purchase. The Government similarly has sustained its burden with respect to these five charges.

### 4. WORLDSTAR—CHARGES 11–12

Worldstar began trading with A–1 in 1989; the agreed terms of business were payment by check, ordinarily postdated to thirty days after delivery. (Exh. 2, at 244–51, 252–63). On June 30, 1994, A–1 ordered and took delivery of ten computer monitors valued at HK $16,000, in exchange for which Worldstar received a postdated check, for August 15, 1994 (beyond thirty days and one day after Cheung's departure) on A–1's American Express Account. (Exh. 2, at 248, 253, 255). On July 8, 1994, A–1 ordered and took delivery of more computer goods, in the amount of HK $18,940; no check was given. (Exh. 2, at 248–49, 257, 582). On August 15, 1994, Worldstar deposited the check for the first delivery, but was informed that the account was closed. (Exh. 2, at 249–50). In that these transactions all occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 5. SYSTEM–PRO—CHARGE 15

System-Pro started trading with A–1 in 1993; the terms of business were payment by checks postdated to thirty days after delivery of the goods. (Exh. 2, at 264–65). On July 19, 1994, A–1 ordered goods worth HK $28,025, for which System–Pro received a check drawn on A–1's American Express Ac-

count, postdated to August 24, 1994. (Exh. 2, 267, 273–77, 285). On August 16, 1994, System–Pro learned that A–1 had closed down and has not been paid. (Exh. 2, at 269–70). Because this transaction occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 6. PURE—CHARGE 16

Pure began trading with A–1 in 1992; the agreed terms of business were payment within thirty days of delivery. (Exh. 2, at 290–95, 296–300). On July 23, 1994, A–1 took delivery of twenty-four printers from Pure, at a price of HK $36,200. (Exh. 2, at 293, 296, 298, 588). On August 17, 1994, Pure learned that A–1 had closed and never was paid. (Exh. 2, at 293). In that this transaction occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 7. CHEVALIER—CHARGE 17

Chevalier began trading with A–1 in 1989; the agreed terms of business were payment by check, postdated to thirty days after delivery of the goods. (Exh. 2, at 301–09, 310–25). On July 25, 1994, A–1 took delivery of goods from Chevalier in the amount of HK $88,400, in exchange for a check drawn on A–1's American Express Account, signed by Cheung and postdated to August 30, 1994. (Exh. 2, at 305–07, 311–17, 319). On August 16, 1994, Chevalier learned that A–1 had closed down and the check failed to clear. (Exh. 2, at 307–08). In that this transaction occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 8. ASIAN ELECTRONICS— CHARGES 20, 29 & 31

Asian began trading with A–1 in 1989; the agreed terms of business were payment by check, postdated to thirty days after delivery of the goods. (Exh. 2, at 326–37, 339–75, 326). On July 27, 1994, A–1 took delivery of goods from Asian Electronics in the value of HK $80,000, in exchange for which Asian Electronics received a check drawn on A–1's American Express Account, postdated to Au-

gust 31, 1994. (Exh. 2, at 329–31, 339–45, 347, 602, 613). On August 6, 1994, Cheung placed another order for goods in the value of HK $78,452, in exchange for which Asian Electronics received a check drawn on A–1's Kincheng Account, postdated to September 8, 1994. (Exh. 2, at 333–35, 365–69, 371). On August 9, 1994, Cheung placed an additional order for goods in the amount of HK $51,000, in exchange for which Asian Electronics received a check drawn on A–1's Kincheng Account, postdated to September 8, 1994. (Exh. 2, at 333–35, 365–69, 371). On August 16, 1994, Asian Electronics learned that A–1 had closed down and the three checks were not honored. (Exh. 2, at 335–36). Because all three transactions all occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 9. VTECH—CHARGE 21

Vtech began trading with A–1 in 1989; the agreed terms of business were payment by check, postdated to thirty days after delivery of goods. (Exh. 2, at 376–81, 382–87). On July 28, 1994, A–1 took delivery of ten notebook computers and other accessories from Vtech in the amount of HK $73,000, in exchange for which Vtech received a check drawn on A–1's American Express Account, postdated to August 28, 1994. (Exh. 2, at 379–80, 383, 385, 621). On or about August 16, 1994, Vtech learned that A–1 had closed down and Vtech never received payment. (Exh. 2, at 379–80). In that this transaction occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 10. ASIAN INSTRUMENTS— CHARGE 22

Asian Instruments began trading with A–1 in 1990; the agreed terms of business were payment by check, postdated to thirty days after delivery of goods. (Exh. 2, at 388–94, 395–404). On July 28, 1994, A–1 took delivery of goods, including notebook computers, from Asian Instruments in the amount of HK $69,420, in exchange for which Vtech received a check drawn on A–1's Kincheng Account, postdated to September 3, 1994.

(Exh. 2, at 396–98, 400). On or about August 16, 1994, Asian Instruments learned that A–1 had closed down and the Kincheng check was not honored. (Exh. 2, at 393). Because this transaction occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 11. TECH—CHARGES 23 & 33

Tech began trading with A–1 since at least 1994; the agreed terms of business were payment by check, postdated to thirty days after delivery of goods. (Exh. 2, at 405–13, 415–29). On July 30, 1994, A–1 took delivery of goods from Tech in the amount of HK $47,500, signed by Cheung, in exchange for which Tech received a check drawn on A–1's Kinseng Account, postdated to September 4, 1994. (Exh. 2, at 408–10, 415–18, 419). On August 8, 1994, Cheung placed an additional order from Tech, in the amount of HK $39,000, in exchange for which Tech again received a check drawn on A–1's Kinseng Account, postdated to September 9, 1994. (Exh. 2, at 410–11, 421, 423). On August 16, 1994, Tech learned that A–1 had closed down and both checks were dishonored. (Exh. 2, at 411–12). In that both transactions occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 12. TOPPAN—CHARGES 24 & 32

Toppan began trading with A–1 in 1991; the agreed terms of business were payment by check, postdated to thirty days after delivery of goods. (Exh. 2, at 430–39, 440–52). On August 4, 1994, Cheung ordered goods from Toppan in the amount of HK $86,976, in exchange for which Toppan received a check drawn on A–1's Kinseng Account, postdated to September 5 1994; Cheung signed the invoices. (Exh. 2, at 433–34, 440, 442). On August 9, 1994, Cheung placed another order, for goods in the amount of HK $80,356, in exchange for which Toppan received a check drawn on A–1's Kinseng Account, postdated to September 9, 1996. (Exh. 2, at 435–36, 444, 446). On August 16, 1994, Toppan learned that A–1 had closed down and the two checks Toppan had received were dishonored. (Exh. 2, at 436–37). Because

these two transactions occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 13. ABLE—CHARGE 25

Able began trading with A–1 prior to 1990; the agreed terms of business were payment by check, postdated to fourteen days after delivery of goods. (Exh. 2, at 453–56, 457–65). On August 4, 1994, Cheung took delivery of goods from Able in the amount of HK $49,322.40, in exchange for which Able received a check drawn on A–1's Kinseng Account, postdated to August 18, 1994. (Exh. 2, at 455–56, 459, 461,646). On August 16, 1994, Able learned that A–1 had closed down and the check A–1 had given Able was dishonored. (Exh. 2, at 456–57). In that this transaction occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 14. FLOURISH—CHARGES 26–27

Flourish began trading with A–1 in April 1994; the agreed terms of business were payment by check, postdated to fourteen days after delivery of goods. (Exh. 2, at 466–74, 475–87). On August 5, 1994, A–1 took delivery of two batches of goods from Flourish in the amounts of HK $45,600 and HK $18,780, in exchange for which Flourish received two checks drawn on A–1's American Express Account, postdated to August 19, 1994. (Exh. 2, at 469–73, 475, 479, 477, 481, 652). On August 17, 1994, Flourish learned that A–1 had closed down and the two checks A–1 had given Flourish were dishonored. (Exh. 2, at 472). Because these two transactions occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### 15. VIEWKING—CHARGE 30

Viewking began trading with A–1 in 1993; the usual terms of business were cash on delivery. (Exh. 2, at 488–95, 497–511). On August 8, 1994, Cheung took delivery of two batches of goods from Viewking in the amounts of HK $36,904.50 and HK $1,901.50, which Cheung accepted, in exchange for which Viewking agreed to receive a check drawn on A–1's Kincheng Account, postdated to August 18, 1994. (Exh. 2, at 490–92, 499, 505, 507). On or about August 16, 1994, Viewking learned that A–1 had closed down and the check Viewking received from A–1 was dishonored. (Exh. 2, at 494). In that this transaction occurred after Cheung purchased the airplane tickets in Toronto, the Government has more than satisfied its burden here.

### II. CONCLUSION

Accordingly, for the reasons stated above, the Government's request for extradition is hereby *granted*, albeit reluctantly. The Certification of Extraditability and Order of Commitment shall be signed on May 12, 1997, unless defendant obtains a stay of execution prior thereto.[19]

---

19. The Court commends Assistant United States Attorney Jeffrey A. Meyer and Federal Public Defender Richard A. Reeve for their truly outstanding written submissions and oral argument on behalf of their clients, and for the extremely professional manner in which they approached this novel and sensitive issue.