**John CHEUNG, Petitioner–Appellee,**

v.

**UNITED STATES of America, Respondent–Appellant.**

**Docket No. 99–2526.**

United States Court of Appeals, Second Circuit.

Argued March 1, 2000.

Decided May 23, 2000.

Jeffrey A. Meyer, Assistant United States Attorney (Stephen C. Robinson, United States Attorney for the District of Connecticut, of counsel), for Appellant.

Richard A. Reeve, Sheehan & Reeve, New Haven, CT, for Appellee.

Before: McLAUGHLIN, SACK, and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

The United States appeals from a final judgment of the United States District Court for the District of Connecticut (Peter C. Dorsey, *Judge*), granting John Cheung's petition for a writ of habeas corpus and ordering his discharge from custody pursuant to a ruling by United States Magistrate Judge Joan G. Margolis granting the Government's request for extradition. For the reasons that follow, we reverse the judgment of the district court and remand with instructions to vacate the writ of habeas corpus and to enter a certification of extraditability and order of commitment.

## I. BACKGROUND

We decide on appeal whether the Agreement between the Government of the United States of America and the Government

of Hong Kong For the Surrender of Fugitive Offenders (the "Hong Kong Extradition Agreement" or the "Agreement"), Dec. 20, 1996, U.S.-H.K., S. Treaty Doc. No. 105-3 (1997), is a "treaty" between the United States and a "foreign government" such that the magistrate judge had jurisdiction to certify Cheung's extraditability. *See* 18 U.S.C. § 3184. To provide a context for understanding the opinions below and our discussion, we recount briefly the evolution of the legal status of Hong Kong,[1] the development of the extradition relationship between the United States and Hong Kong, and the procedural background of this case.

A. *Legal Relationship between Hong Kong and the People's Republic of China*

Prior to the Opium Wars of the mid-19th century between China and the United Kingdom (the "U.K."), Hong Kong was an integral part of imperial China. British rule over Hong Kong was achieved in three stages. In 1842, China ceded rule over Hong Kong Island to the U.K. "in perpetuity" through the Treaty of Nanking, which settled the First Opium War. *See* Ming K. Chan, *Hong Kong: Colonial Legacy, Transformation, and Challenge,* 547 ANNALS AM. ACAD. POL. & SOC. SCI. 11, 12 (1996). Under the 1860 Convention of Peking, which ended the Second Opium War, China relinquished the Kowloon Peninsula permanently. *See id.;* Roger Buckley, *Hong Kong: The Road to 1997* 2–3 (1997). Finally, following China's defeat in the Sino–Japanese War of 1894–95, the U.K. secured a lease of the New Territories for 99 years, until June 30, 1997. *See* Chan, *supra,* at 12; Buckley, *supra,* at 3.

As the lease period for the New Territories ran toward expiration, the U.K. and the People's Republic of China (the "PRC") initiated negotiations for the return of sovereignty over Hong Kong to the

PRC. These talks culminated in the Joint Declaration on the Question of Hong Kong (the "Joint Declaration"), which the U.K. and the PRC signed on December 19, 1984. *See* Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China ("Basic Law"), preamble, at ii. In 1990, China promulgated the Basic Law, a framework for the governance of Hong Kong upon reversion to Chinese rule. The Basic Law created the Hong Kong Special Administrative Region (the "HKSAR"), governed by the principle of "one country, two systems." Basic Law, preamble, at ii. Under this principle, Hong Kong is recognized as an "inalienable part" of the PRC, but its capitalist system is to be "unchanged for 50 years [from July 1, 1997]." Basic Law, arts. 1 & 5.

The Basic Law establishes an executive authority, *see* Basic Law, art. 59, and enumerates its powers and functions, among them, "to conduct relevant external affairs on its own" subject to the ultimate authority of the central government of the PRC, *id.,* art. 13; *see id.,* art. 62(3). It also creates a new legislature, *see id.,* arts. 66–79 & annex II, and preserves the existing judicial system, except for the creation of a new high court, the Court of Final Appeal. *See id.,* arts. 81 & 82. Moreover, the Basic Law authorizes the HKSAR government to "make appropriate arrangements with foreign states for reciprocal juridical assistance" subject to the approval of the central government of the PRC. *Id.,* art. 96.

B. *The Hong Kong Policy Act*

In 1992, Congress enacted the United States–Hong Kong Policy Act (the "Hong Kong Policy Act" or the "Act"), 22 U.S.C. §§ 5701–5732. *See* Pub.L. No. 102–383, 106 Stat. 1448 (1992). Among other things, the Act expresses the support of the President and Congress for the 1984 Joint Declaration, *see* 22 U.S.C. § 5701,

---

**1.** As used in this opinion, "Hong Kong" refers to the physical territory comprising three areas: Hong Kong Island, the Kowloon Peninsula, and the New Territories (an area comprising 92 percent of the total terrain of the three areas).

and articulates a general bilateral framework for U.S. relations with the HKSAR after June 30, 1997, *see* 22 U.S.C. §§ 5711–5715. The Act expresses the sense of Congress that the United States should seek to establish and expand direct bilateral agreements with the HKSAR in ten particularized areas as well as "other appropriate areas;" foreign relations is not specifically enumerated. 22 U.S.C. § 5711(2). The Act also calls for the United States to "continue to fulfill its obligations to Hong Kong under international agreements" on the basis of reciprocity, regardless of whether the PRC is a signatory to the particular international agreement, unless and until such obligations are legally modified or terminated. 22 U.S.C. § 5712(2).

### C. *United States–Hong Kong Extradition Relations*

From 1977 to June 30, 1997, extradition relations between the United States and Hong Kong were governed by the Treaty on Extradition between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972, U.S.-U.K., 28 U.S.T. 227, made applicable to Hong Kong by an exchange of diplomatic notes on October 21, 1976, *see* 28 U.S.T. at 238–41, and the Extradition Supplementary Treaty Concerning the Extradition Treaty Between the United States of America and the United Kingdom of Great Britain and Northern Ireland, June 25, 1985, T.I.A.S. No. 12050 (the "Supplementary Treaty"), made applicable to Hong Kong by its terms. *See* Supplementary Treaty, art. 6(a) & annex; *see also In re Request for Extradition of McMullen*, 989 F.2d 603, 608 (2d Cir.1993) (describing the Supplementary Treaty); *United States v. Kin–Hong*, 110 F.3d 103, 108 & n. 5 (1st Cir.) (describing the treaties), *stay denied*, 520 U.S. 1206, 117 S.Ct. 1491, 137 L.Ed.2d 816 (1997).

Anticipating the expiration of the these treaties upon the restoration of Chinese rule over Hong Kong, the United States and Hong Kong in 1996 concluded the Hong Kong Extradition Agreement as a replacement. In March 1997, the President transmitted the Agreement to the Senate for its advice and consent. With the transmittal letter, the President included a letter of submittal from the Secretary of State noting that the agreement was a "treaty" for purposes of United States law:

> Although entitled an "Agreement" to reflect Hong Kong's unique juridical status, for purposes of U.S. law, the instrument will be considered to be a treaty, and therefore I am submitting it to you for transmittal to the Senate for advice and consent to ratification.

*Id.* at v. The Agreement was favorably reported by the Senate Committee on Foreign Relations (the "Committee") to the full Senate on August 19, 1997. *See* S. Exec. Rep. No. 105–2 at 8–10 (1997). On October 23, 1997, the Agreement was ratified by a two-thirds vote of the Senate. *See* 143 Cong. Rec. S11,165–02 (daily ed. Oct. 23, 1997).

The Agreement enumerates 36 categories of "offences" for which a fugitive shall be surrendered, including "[o]btaining property or pecuniary advantage by deception; ... unlawful handling or receiving of property; ... or any other offence in respect of property involving fraud[.]" Hong Kong Extradition Agreement, art. 2(1)(x). Article 13 provides that the alleged offender shall be surrendered if the evidence against the fugitive satisfies the standards of the requested country for holding a defendant over for trial, or if the evidence is sufficient to find the fugitive guilty, to convict, or to sentence under the law of the requesting country. *See id.*, art. 13. However, the Agreement prohibits extradition for alleged political offenses and creates a humanitarian exception to extradition. *See id.*, arts. 6 and 7. Finally, the Agreement establishes procedures for requesting and surrendering a fugitive. *See id.*, arts. 8–12, 14–19.

D. *This Case*

1. *Procedural Background*

The essential facts of this case are undisputed. In June 1998, Cheung was arrested in Connecticut to answer a complaint for extradition pursuant to the Hong Kong Extradition Agreement. The complaint charged him with 33 counts of obtaining property by deception and one count of evasion of liability by deception under Hong Kong law. *See In re Extradition of Cheung*, 968 F.Supp. 791, 796–97, 805–09 (D.Conn.1997) (*"Cheung I"*) (detailing the counts).[2] In particular, Cheung was accused of having engaged in criminal fraud during mid–1994 in connection with his ownership and operation of a chain of consumer electronics retail stores in Hong Kong. *See id.* at 804. The fraud involved acquiring nearly HK\$ 2 million of computer goods from wholesale suppliers, for which Cheung promised to pay on an installment basis. *See id.* After accumulating the debt for these goods, Cheung and his family fled Hong Kong for Canada in August 1994, and eventually resettled in Connecticut, where Cheung was later arrested. *See id.* at 796, 805. Prior to leaving Hong Kong, Cheung had allegedly issued post-dated checks to his suppliers that were purportedly dishonored upon presentation. *See id.* at 805–09.

On December 24, 1998, Magistrate Judge Margolis held an extradition hearing pursuant to the federal extradition statute, 18 U.S.C. §§ 3181–3196. *See United States v. Cheung*, No. 3:98M51, slip op. at 13 (D.Conn. Feb. 5, 1999) (*"Cheung II"*). Section 3184 provides, in relevant part:

Whenever there is a treaty or convention for extradition between the United States and *any foreign government* [ ] any justice or judge of the United States, or any magistrate authorized by a court of the United States ... may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged....

18 U.S.C. § 3184 (emphasis added). Cheung challenged the court's jurisdiction on the ground that the Hong Kong Extradition Agreement was not a treaty between the United States and a "foreign government" as that term is used in § 3184. *See Cheung II*, slip op. at 6–7. He argued that a "foreign government" refers to the government of a foreign sovereign. *See id.* Because the HKSAR government is a subsovereign of the PRC, he asserted that the HKSAR government is not a cognizable party under § 3184, and, therefore, no enforceable treaty exists which authorizes his extradition to the HKSAR. *See id.* In the absence of such a treaty, he contends that the magistrate judge lacked jurisdiction under § 3184 to certify his extraditability.

2. *The Magistrate Judge's Decision*

The magistrate judge held that the Hong Kong Extradition Agreement is valid and enforceable. *See id.* at 7–8. She noted that, notwithstanding the PRC's ultimate control of foreign affairs relating to the HKSAR, Article 151 of the Basic Law provides that the HKSAR government "may, on its own, using the name 'Hong Kong, China,' maintain and develop relations and conclude and implement agreements with foreign states and regions." *Id.* at 4. The magistrate judge also observed that the Basic Law created execu-

---

**2.** In *Cheung I*, decided before Hong Kong's return to Chinese rule, the magistrate judge granted a prior request for Cheung's extradition. *Id.*, 968 F.Supp. at 809. Subsequently, on July 15, 1997, without objection by the Government, the district court granted Cheung's petition for a writ of habeas corpus in light of Hong Kong's reversion. The present case commenced upon the Government's filing of a second complaint for extradition, dated June 24, 1998.

tive, judicial, and legislative bodies which govern Hong Kong, authorized an economic system independent of the PRC, and preserved civil and political rights. *See id.* at 4. Based largely on these factors, the magistrate judge concluded that:

> [w]ith its own legislative body, its "high degree of autonomy on all matters other than defense and foreign affairs," and its unique "one country, two systems" for economic and legal matters, under the Basic Law and the United States–Hong Kong Policy Act, HKSAR does constitute a "foreign government" for purposes of § 3184.

*Id.* at 7.

Having found at a prior proceeding probable cause to believe that Cheung is guilty of the charged offenses, *see Cheung I*, 968 F.Supp. at 805–09, the magistrate judge granted the Government's request for extradition.

### 3. *The District Court's Decision*

Cheung timely filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, which the district court granted without a hearing. *See In re Extradition of John Cheung*, No. 3:99MC110, slip op. at 6–7 (D.Conn. Sept. 1, 1999) ("*Cheung III*"). The court noted that 18 U.S.C. § 3184 confers jurisdiction on federal courts to hold extradition proceedings only pursuant to treaties with a "foreign government." *See id.* at 2. It then interpreted the term "foreign government" by reference to 18 U.S.C. § 3181, *see id.* at 3, which provides, in relevant part:

> The provisions of this chapter relating to the surrender of persons who have committed crimes in *foreign countries* shall continue in force only during the existence of any treaty of extradition with *such foreign government.*

18 U.S.C. § 3181(a) (emphasis added). The court construed "such foreign government" to refer to the government of the "foreign country" where the charged crime was allegedly committed. *See Cheung III*, slip op. at 2–3. It held that because the

HKSAR is not a "foreign country," the Hong Kong Extradition Agreement did not satisfy the § 3184 condition precedent for federal jurisdiction over Cheung's extradition. *See id.* at 6. In so holding, the district court implicitly equated a "foreign country" with a "foreign sovereign." *See id.* at 2–3.

The court also reasoned that Congress was unlikely to have intended to extradite foreign nationals to subsovereigns. *See id.* at 4. In support of this conclusion, the court noted several cases which have referred to extradition as a process between sovereign nations. *See id.*

Moreover, the district court held that neither the Hong Kong Extradition Agreement nor the Hong Kong Policy Act can be construed to have modified or repealed the federal extradition statute. *See id.* at 4–5. As to the Agreement, the district judge reasoned that this effort "by the Executive branch and the Senate do[es] not supplant the prior legislation of the entire Congress." *Id.* at 5. Where Congress has exercised its authority to limit the Executive's latitude in conducting foreign relations by enacting the extradition statute, extradition contrary to the terms of the statute would "pose[] a substantial threat to the separation of powers." *Id.* at 6. As to the Policy Act, the district court found no "repugnancy" between the Act and the statute since the Act merely affirmed Congress's intent to fulfill existing treaty obligations, but did not itself authorize extradition. *See id.* at 5.

Accordingly, the district court held that Cheung may not be extradited to the HKSAR pursuant to § 3184 and ordered his release from custody. *See id.* at 6–7. This appeal by the Government followed.

## II. DISCUSSION

In the United States, extradition is governed by the federal extradition statute. *See* 18 U.S.C. §§ 3181–3196. Section 3184 of the statute mandates that extradition must be based on a treaty or conven-

tion, with some exceptions not at issue in this case. *See id.* § 3184. In general, extradition treaties have served several functions, including: securing the obligation to surrender a fugitive; insuring reciprocity between the signatories; tailoring the list of extraditable offenses to specific political situations; and establishing the procedures each party must follow vis-a-vis the other. 1 John Bassett Moore, *Moore on Extradition* § 72, at 82 (1890). Whereas the treaty promulgates the inter-party procedures, the federal extradition statute allocates responsibility for extradition within the U.S. Government to a judicial officer and the Secretary of State. *See* 18 U.S.C. § 3184. The judicial officer's inquiry is confined to the following: whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof. *See Lo Duca v. United States,* 93 F.3d 1100, 1103–04 (2d Cir.1996) (detailing the § 3184 procedure); *Kin–Hong,* 110 F.3d at 109–10 (same).

If the judicial officer answers these questions in the affirmative, he or she "shall certify" the extraditability of the fugitive to the Secretary of State. *See* 18 U.S.C. § 3184. An order certifying a request for extradition is not a final judgment that is appealable under 28 U.S.C. § 1291. *See Spatola v. United States,* 925 F.2d 615, 617 (2d Cir.1991). Instead, the fugitive may seek limited review by petitioning for a writ of habeas corpus. *See id.* The parameters of habeas review are narrow. The reviewing court may consider only (1) whether the judge below had jurisdiction; (2) whether the offense charged is extraditable under the relevant treaty; and (3) whether the evidence presented by the Government established probable cause to extradite. *See Austin v. Healey,* 5 F.3d 598, 600 (2d Cir.1993).

If habeas relief is denied, the Secretary of State has sole discretion to weigh the political and other consequences of extra-

dition and to determine finally whether to extradite the fugitive. *See* 18 U.S.C. § 3186; *see also Murphy v. United States,* 199 F.3d 599, 601–02 (2d Cir.1999) "[T]he question of the wisdom of extradition remains for the executive branch to decide." (quoting *Wacker v. Bisson,* 348 F.2d 602, 606 (5th Cir.1965)); *Lo Duca,* 93 F.3d at 1104 (explaining that the Secretary of State is under no legal duty to extradite a certified fugitive); *Kin–Hong,* 110 F.3d at 109–10 (discussing the scope of the Secretary of State's prerogative).

This case requires us to conduct the first prong of the habeas analysis: whether the magistrate judge had subject matter jurisdiction to certify Cheung's extraditability. That depends, in turn, on whether the Hong Kong Extradition Agreement is a "treaty" between the United States and a "foreign government" within the meaning of the federal extradition statute. For the reasons explained below, we hold that the Agreement is, but for somewhat different reasons than the magistrate judge articulated.

## A. *The Political Question Doctrine*

It has long been part of our settled law that the authority to recognize a foreign government is constitutionally committed to the Executive Branch. *See, e.g., Williams v. Suffolk Ins. Co.,* 38 U.S. (13 Pet.) 415, 420, 10 L.Ed. 226 (1839) ("[W]hen the executive branch of the government, which is charged with our foreign relations, shall ... assume a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department[.] ... [I]t is not material to inquire, nor is it the province of the Court to determine, whether the executive be right or wrong."); *First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 767, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (noting the primacy of the Executive in matters of recognition); *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (explaining when an issue is nonjusticiable under the political question doctrine and

stating that the "recognition of foreign governments ... strongly defies judicial treatment"); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 764 (2d Cir.1998) ("Our court held that recognizing foreign states and governments is a function of the executive branch ....."), *cert. denied*, 525 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999). Federal courts lack the authority and institutional competence to make the political judgments involved in ascertaining the legitimacy of foreign systems. Thus, in this case, it is not for the courts to decide whether the HKSAR government is a legitimate government. Instead, our role is limited to answering the prior definitional question: what does the term "foreign government" in the extradition statute mean? More precisely, the question we must address is whether the government of a subsovereign constitutes a "foreign government" or the government of a "foreign country" for purposes of § 3184. Put another way, for most purposes of United States foreign relations, the HKSAR government is the government of Hong Kong because it has been recognized as such by the Executive, but it is a "foreign government" within the meaning of the extradition statute only if the judiciary interprets that term to encompass subsovereigns. *See Baker*, 369 U.S. at 212, 82 S.Ct. 691 (noting that while "the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory, once sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area" (footnotes omitted)). With this clarification, we turn to the text of the extradition statute.

B. *Interpreting the Federal Extradition Statute*

1. *The Text*

■ Cheung argues, and the district court held, that the extradition statute authorizes the United States to enter into extradition treaties with only foreign sovereigns. In construing the terms of a statute, we look first to its language to ascertain its plain meaning. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *Weinberger v. Rossi*, 456 U.S. 25, 28, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982); *Disabled in Action of Metro. New York v. Hammons*, 202 F.3d 110, 119 (2d Cir.2000) (citations omitted); *In re Boodrow*, 126 F.3d 43, 49 (2d Cir.1997) (citation omitted), *cert. denied*, 522 U.S. 1117, 118 S.Ct. 1055, 140 L.Ed.2d 118 (1998).

■ The extradition statute confers jurisdiction on federal judicial officers to conduct extradition proceedings based on "a treaty or convention for extradition between the United States and any foreign government." 18 U.S.C. § 3184. Although the term "treaty" is commonly understood in modern usage as a "contract[ ] between independent nations," *Santovincenzo v. Egan*, 284 U.S. 30, 40, 52 S.Ct. 81, 76 L.Ed. 151 (1931), the term was not necessarily so limited in the mid–19th century (or now) when the federal extradition statute was enacted. It is true that at the time Congress passed the act, the United States had ratified only two extradition treaties, both with sovereign nations— France and England. *See* Moore, *supra*, § 74, at 84 (discussing Treaty of 1843 with France), § 78, at 84 (Treaty of 1794 with Great Britain), § 79, at 92–93 (Treaty of 1842 with Great Britain). However, the United States had also ratified hundreds of treaties with Indian tribes or nations. *See* Francis Paul Prucha, *American Indian Treaties* 1, 67 (1994) (noting that between 1778–1868, there were 367 ratified Indian treaties); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 549–53, 8 L.Ed. 483 (1832) (discussing post-Revolutionary War treaties with the Delaware and Cherokee Nations); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16, 8 L.Ed. 25 (1831) (noting the numerous treaties between the Cherokee Nation and the United States); *United States v. Claus*, 63 F.Supp. 433, 434

(W.D.N.Y.1944) (discussing the impact of the Selective Service Act on treaties with various Indian tribes signed between 1784 and 1794). From the first years of our constitutional republic, the Indian treaties have enjoyed a status "on a par with foreign treaties," *id.* at 67; *see* Felix S. Cohen, *Handbook of Federal Indian Law* 33–34 (1988) ("That treaties with Indian tribes are of the same dignity as treaties with foreign nations is a view which has been repeatedly confirmed by the federal courts[.]") (footnote omitted). This has been the case even though Indian treaty partners have been described as "domestic dependent nations" insofar as they had ceded powers generally associated with sovereignty, including the right freely to carry out foreign relations and trade. *Cherokee Nation,* 30 U.S. at 17; *see* Prucha, *supra,* at 5, 7.

Thus, it is clear that the term "treaty" had a meaning broader than an agreement between fully sovereign or independent entities. Indeed, at the time the extradition statute was enacted in 1848, "treaty" was also defined as "[t]he treating of matters with a view to settlement; discussion of terms, conference negotiations" and "[a] settlement or arrangement arrived at by treating or negotiation." *Oxford English Dictionary* 465 (2d ed.1991) (providing annotations about the uses of words in different historical eras); *see* Prucha, *supra,* at 24. Nothing in these definitions suggest that only a sovereign nation can enter into treaties, as Cheung contends.

■ We consider next the § 3184 requirement that the treaty be between the United States and "any foreign government." We believe the district court correctly construed "foreign government" by reference to § 3181, which clarifies that the relevant foreign government is the government of the foreign country where the alleged extraditable crime was committed.[3] This provision expressly applies to the entire chapter 209 of title 28. Moreover, the title of § 3184—"Fugitives from foreign country to United States"—also indicates that the term "any foreign government" within the text means the government of any foreign country. "Although mindful of the limited role of statutory headings in textual interpretation," this Court has recognized that statutory headings may be used to resolve ambiguities in the text. *United States v. Baldwin,* 186 F.3d 99, 101 (2d Cir.) (per curiam), *cert. denied,* —— U.S. ——, 120 S.Ct. 558, 145 L.Ed.2d 433 (1999). Thus, federal courts have jurisdiction over extradition complaints only when a valid treaty exists between the United States and the government of the foreign country where the alleged offense occurred.

If § 3184 contains a sovereign nation requirement, that requirement would have to derive from the term "foreign country," because it cannot be implied from the term "treaty." The district court, without discussion, equated "foreign country" with a foreign sovereign or foreign central government. The Government contests this interpretation, arguing that if a "foreign country" means only a foreign sovereign government, then the word "any" in "any foreign government" would be rendered meaningless. *See* 18 U.S.C. § 3184. It maintains that the HKSAR government is indisputably both "foreign" and a "government" and therefore falls within the meaning of "any foreign government." It ar-

---

3. In 1948, as part of an overall recodification of title 18 of the United States Code, § 3181 was amended. Prior to the 1948 amendments, this section read:

 The provisions of this Title relating to the surrender of persons who have committed crimes in foreign countries shall continue in force during the existence of any treaty of extradition with *any foreign government, and no longer.*

R.S. § 5275, *reprinted in* H.R.Rep. No. 80–304, at 242 (1948) (emphasis added). The recodification changed "Title" to "chapter" and "any foreign government, and no longer" to "such foreign government." 18 U.S.C. § 3181. The legislative history of the amendment makes clear that it resulted in only "[m]inor changes ... in phraseology." H.R.Rep. No. 80–304, at 158 (1948).

gues further that if Congress had intended to restrict the authority of the Executive to enter into extradition treaties with foreign sovereigns only, it would have used the modifiers "national," or "central," or "fully autonomous" foreign government.

We agree with the Government that a "foreign country" does not refer solely to a foreign sovereign or independent nation. Both now and in the mid–1800's, the word "country" had a variety of meanings, including, among others: "a tract or expanse of land of undefined extent," *Oxford English Dictionary, supra,* at 1041; "a tract or district having more or less definite limits in relation to human occupation," *id.;* and the territory or land of a nation; *usually* an independent state, or a region once independent and still distinct in race, language, institutions, or historical memories, *id.* at 1042 (emphasis added). Under the first two definitions, "country" denotes a geographic, not political, concept. To the extent that the term "foreign country" as used in the extradition statute describes where the alleged offense occurred, *see* 18 U.S.C. §§ 3181 & 3190, it could certainly be referring to the physical land or a place abroad. Under this conception, Hong Kong could be a "foreign country," in which case the HKSAR government could be the government of a "foreign country" under § 3181 and a "foreign government" under § 3184. If "country" is understood as a political entity, as under the third definition, it is "usually" an independent state, and thus need not always be so. The Supreme Court has long recognized the ambiguity of the term "foreign country" as reflected in these various meanings:

> It may be taken to mean foreign territory or a foreign government. In the sense of territory, it may embrace all of the territory subject to a foreign sovereign power. When referring more particularly to a foreign government, it may describe a foreign state in the international sense ...; or it may mean a foreign government which has authority over a particular area or subject-matter, although ... only a component part, or a political subdivision, of the larger international unit.

*Burnet v. Chicago Portrait Co.,* 285 U.S. 1, 5–6, 52 S.Ct. 275, 76 L.Ed. 587 (1932). Because the terms in §§ 3181 and 3184 neither compel nor exclude the interpretation urged by either Cheung or the Government, we must look beyond the text.

## 2. *Ambiguity and Statutory Purpose*

■ Where a statute is textually ambiguous, its terms must be determined by reference to the purpose of the particular statute. In *Burnet,* the Supreme Court held that the State of New South Wales was a "foreign country" within the meaning of § 238(a) of the 1921 Revenue Act, which granted a credit for taxes paid by a domestic corporation to "any foreign country." *Id.* at 4 n. 1, 21, 52 S.Ct. 275. Finding that "the primary design of the provision was to mitigate the evil of double taxation," *id.* at 7, 52 S.Ct. 275, the Court determined that the tax burden was the same regardless of whether the taxing authority was a foreign sovereign or a lesser political entity, so long as that authority reciprocated, *see id.* at 10, 52 S.Ct. 275. Similarly, in interpreting the terms "country" and "foreign country" as used in other statutory contexts, courts have not equated these terms with a sovereign when that definition did not accord with legislative intent, but instead have construed the terms broadly to encompass regions without a sovereign as well as subsovereign authorities. *See, e.g., Smith v. United States,* 507 U.S. 197, 204–05, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (presuming that Congress had not intended to legislate extraterritorially and holding that the "foreign country" exception in the Federal Tort Claims Act applied to Antarctica); *Lee Wei Fang v. Kennedy,* 317 F.2d 180, 184–85 n. 5 (D.C.Cir.1963) (holding, in light of Congress's desire to reduce the number of undeportable aliens, that "Hong Kong, a British Crown Colony, is of course a 'country,'" to which aliens may be deported,

pursuant to the Immigration and Nationality Act); *Chan Chuen v. Esperdy*, 285 F.2d 353, 354 (2d Cir.1960) (per curiam) (noting that "[t]he word 'country' has no fixed meaning" and deciding, for purposes of the Immigration and Nationality Act, that "any place possessing a government with authority to accept an alien deported from the United States can qualify as a 'country'," including then-British colony Hong Kong).

In interpreting "country" in the specific context of the federal extradition law, our task is "to consider the object of the [statute] and to construe [its terms] so as to achieve, not defeat, its aim." *Burnet*, 285 U.S. at 7, 52 S.Ct. 275. In so doing, we are mindful of another rule of statutory interpretation that applies when the statute at issue concerns foreign policy, as here. The Supreme Court has explained that "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains...." *Rossi*, 456 U.S. at 32, 102 S.Ct. 1510 (quoting *Murray v. The Charming Betsy*, 2 Cranch 64, 118, 2 L.Ed. 208 (1804) (internal quotation marks omitted)); *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 19–20, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) (giving the National Labor Relations Act an interpretation consistent with existing international law and treaty, where its text and legislative history did not mandate otherwise). We therefore review the legislative history of the extradition statute to determine if anything in it precludes us from construing that act in such a way "so as to give effect to both" the act and the Agreement. *Blanco v. United States*, 775 F.2d 53, 61 (2d Cir.1985).[4]

### 3. *Legislative History of the Federal Extradition Statute*

▮ To ascertain the meaning of a textually ambiguous statute, we may con-

sult its legislative history. *See, e.g., Oklahoma v. New Mexico*, 501 U.S. 221, 236 n. 5, 111 S.Ct. 2281, 115 L.Ed.2d 207 (1991); *Disabled in Action*, 202 F.3d at 124 (citations omitted); *see generally* William N. Eskridge, Jr. et al., *Legislation and Statutory Interpretation* 295–307 (2000). The legislative history of the federal extradition statute is sparse. The Government points to—and our research has revealed—only one substantive comment by one of the original bill sponsors which sheds any light on our inquiry:

> [B]y treaty stipulations made with more than one Government of Europe, we were bound to deliver up fugitives who have fled from justice on the commission of crime. *Cases ... showed that it was necessary to enlarge the facilities to comply with our obligations.* It often happened that an individual came to this country where the crime was obvious, and the application for the fugitive regular; but there were no such officers in the part of the country where the fugitive was found as were authorized or were willing to take on themselves the burden and weighty responsibility of issuing a warrant to arrest and to take the preliminary proceedings toward handing over the individual to the properly authorized officer. *The object of this bill was to appoint officers and to authorize others to carry out the provisions of the treaties with France and England,* at all times, without delay and the danger of a denial of justice. It provided for the appointment of commissioners, or authorized the courts of the United States to appoint commissioners to take the preliminary steps, and to procure the authority of the Secretary of State, to whom the treaties give the authority to deliver up fugitives to foreign countries, for the accomplishment of the desired object.

---

4. The courts in *Rossi, McCulloch,* and *Blanco* sought to reconcile a later statute with a pre-existing treaty, whereas in the present case, we seek to reconcile an earlier statute as it applies to a subsequent treaty.

*Cong. Globe*, 30th Cong., 1st Sess. 868 (June 23, 1848) (statement of Rep. J.R. Ingersoll) (emphasis added). As this statement explains, the object of the statute was to enable the United States to meet its obligations under extradition treaties [5] by creating a system for regularizing the review of extradition requests. *See Factor v. Laubenheimer*, 290 U.S. 276, 291 & n. 3, 54 S.Ct. 191, 78 L.Ed. 315 (1933) (noting that the 1848 act prescribed the procedure, which previously did not exist, for apprehending and detaining fugitives for extradition); *see generally United States v. Mackin*, 668 F.2d 122, 134–35 (2d Cir.1981) (describing historical practice near the time § 3184 was enacted); M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 35 (3d ed.1996) (noting that prior to 1848, extradition was carried out without national legislation). The resulting system included a grant of jurisdiction to federal judicial officers and the codification of the Secretary of State's authority to make final extradition decisions. Nothing in the legislative history of the 1848 act shows that Congress was attempting to interfere with the exclusivity of the Executive power to select an appropriate treaty partner. Rather, the only limit that may be fairly implied is that the foreign authority must be capable of concluding a valid treaty with the United States which creates binding rights and responsibilities. To read a sovereignty requirement into the extradition statute that renders the United States incapable of performing its obligations under the Hong Kong Extradition Agreement would undermine the primary design of the statute. We therefore interpret the statute in a manner consistent with the United States's extradition commitments and hold that under 18 U.S.C. § 3184, a "foreign government" is not limited to foreign sovereigns or foreign central governments, but may include subsovereign authorities. Accordingly, the Agreement is a "treaty" between the United States and a "foreign government" and, therefore, the magistrate judge had jurisdiction under § 3184 to certify Cheung's extraditability.

C. *Legislative History of the Hong Kong Extradition Agreement*

Our conclusion is bolstered by the extensive legislative history of the Agreement, which leaves no doubt that in enacting the Agreement, both the Executive Branch and the Senate intended to conclude a treaty with the government of HKSAR, rather than with its sovereign, the PRC. In its report, the Senate Committee expressly declared that the HKSAR government's status as a subsovereign did not undermine the validity of the Agreement:

> The treaty raised several key questions for the Committee and the Senate to consider, not least of which is the unique nature of the treaty itself. *The agreement is with a sub-sovereign entity*, not a sovereign state. Such an arrangement is not the norm. It raises, in particular, a fundamental question about whether the treaty partner has the power to enter such an agreement. It is clear that Hong Kong does; the Agreement has been authorized by both the previous sovereign (the United Kingdom) and the current sovereign (the People's Republic of China).

S. Exec. Rep. No. 105–2, at 8 (emphasis added). Further, notwithstanding the official title of the document, the Committee confirmed the status of the Agreement as a "treaty" within the meaning of the extradition statute:

> [T]his agreement is ... intended to be a "treaty or convention for extradition between the United States and a foreign government" for purposes of Title 18, United States Code, Section 3184.

States had, by 1848, begun negotiations with, among others, Mexico, Prussia, Belgium, and Austria. *See* Moore, *supra*, § 74, at 84.

---

5. Although the statement referred to the treaties with France and England, the object of the extradition law could not have been limited to then-existing treaties because the United

*Id.* at 11.[6] Thus, the Committee confirmed the capacity of the HKSAR government as a subsovereign to enter into the treaty, as required by the extradition statute, and the validity of the Agreement as a treaty under § 3184.[7]

Notably, the Committee did not question the authority of the Executive to enter into an extradition treaty with a subsovereign. On the contrary, the Committee recommended the Agreement to the full Senate for ratification because it would serve dual American policy interests. *See United States v. Pink,* 315 U.S. 203, 229, 62 S.Ct. 552, 86 L.Ed. 796 (1942) (explaining that the political department's authority to recognize a foreign government "includes the power to determine the policy which is to govern the question of recognition."). The first is the obvious interest in law enforcement. The Committee expressed concern that without such an agreement, a "strong possibility" existed that Hong Kong might become a "safe haven" for criminals who have committed crimes in the United States. S. Exec. Rep. No. 105–2, at 10. Second, the Committee urged ratification as a means of sending "a clear message that bilateral treaty relationships with Hong Kong serve to strengthen, not diminish, the autonomy of the Hong Kong government" and that the "PRC must respect the independence of the judicial system in Hong Kong." *Id.* at 9. Thus, although the legislative history of the extradition statute only leaves open the possibility of an extradition treaty with a subsovereign, the legislative history of the Agreement shows that the Senate emphatically supported a treaty with the government of the HKSAR *as a subsovereign.*

**6.** The Committee Report explained that the document was termed an "agreement" rather than a "treaty" and used the word "surrender" rather than "extradite" at the request of the PRC, but referred to these as "semantic preferences" only. S. Exec. Rep. No. 105–2, at 11.

**7.** In recommending the Agreement to the full Senate, the Committee explained that the Agreement had been authorized by the PRC. *See* S. Exec. Rep. No. 105–2, at 8. This fact

### D. *The Status of Treaties*

Cheung argues, and the district court agreed, that enforcement of the Agreement would threaten our system of separation of powers. According to Cheung, an act passed by both houses of Congress and signed by the President cannot be implicitly amended or repealed by a later treaty executed by the President and ratified by the Senate without the participation of the House of Representatives. He contends that a contrary holding would amount to usurpation of Congress's constitutionally vested legislative authority. This argument is premised on a statutory interpretation that brings the 1848 act into conflict with the Agreement, a construction which we have rejected for the reasons explained above.

■■■ Of equal significance, this contention fundamentally miscomprehends the status of treaties in our constitutional scheme. The Supremacy Clause declares the Constitution, federal law, and treaties to be "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. It is well-established that under the Supremacy Clause a self-executing treaty—one that operates of itself without the aid of legislation—is to be regarded in the courts as equivalent to an act of the legislature. *See Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888) (to the extent that treaties are self-executing, they "have the force and effect of a legislative enactment."); *see also* Bassiouni, *supra,* at 72 ("Treaties of extradition are deemed self-executing and therefore equivalent to an act of the legislature." (footnote omitted));

was also noted by the President in his Letter of Submittal, *see* S. Treaty Doc. No. 105–3, at v, and is incorporated into the preamble to the Agreement. The PRC's approval of the Agreement is, however, of no moment to our interpretation of the extradition statute. Whatever significance the political branches of our Government may have attached to the PRC's endorsement, that is a political issue that is constitutionally committed to them.

Louis Henkin, *Foreign Affairs and the United States Constitution* 199 (2d ed.1996) (same).

■ The Agreement is self-executing. *See* Letter of Transmittal, S. Treaty Doc. No. 105–3, at III ("As a treaty, this Agreement will not require implementing legislation."); S. Exec. Rep. No. 105–2, at 2 ("Unlike in the United States, Hong Kong requires additional implementing legislation[.]"); *see also Terlinden v. Ames*, 184 U.S. 270, 288, 22 S.Ct. 484, 46 L.Ed. 534 (1902) ("Treaties of extradition are executory in their character[.]"); *United States v. Balsys*, 119 F.3d 122, 138 n. 13 (2d Cir.1997) (noting that extradition treaties are self-executing), *rev'd on other grounds*, 524 U.S. 666, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998). Thus, contrary to the position of the district court and the petitioner, the Constitution not only allows, but in fact requires, the courts to treat the Agreement as equal to the federal extradition statute, with the goal of harmonizing the two where possible.[8]

We have considered all of the appellee's other arguments and find them to be without merit. Therefore, the judgment of the district court is reversed. We remand this case to the district court to vacate the writ of habeas corpus and to enter a certification of extraditability and an order of commitment.

### CONCLUSION

For the reasons explained above, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

---

8. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936), on which Cheung relies, does not lead to a contrary result. In *Valentine*, the Supreme Court explained that while the executive branch has no independent authority to surrender a fugitive to a foreign country, its discretion to do so may rest upon *either* an act of Congress *or* a treaty. *See id.* at 9, 57 S.Ct. 100.